Nathan A. SLYE, Appellant

v.

UNITED STATES, Appellee

No. 88–1231.

District of Columbia Court of Appeals.

Argued March 26, 1991.
Decided Jan. 15, 1992.

Angela Kiper, with whom James Klein and Page Kennedy, Public Defender Service, were on the brief, for appellant.

Steven J. McCool, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black, and Mary Lou Leary, Asst. U.S. Attys., were on the brief, for appellee.

Before TERRY, STEADMAN and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant, convicted of armed robbery[1] after a jury trial, contends on appeal that the trial court abused its discretion in refusing to impose sanctions for the government's failure to preserve recordings of calls made to the "911" emergency telephone number which contained a description of the robber, and in admitting testimony about his supposed poverty. We reject both contentions and affirm the conviction.

I

Gregory Collier worked the evening shift as an attendant at Daniel's Chevron service station. At approximately 10:30 p.m. on October 3, 1986, Collier was counting money in the station office, intending to put some of it in the safe, when he noticed a man walking across the station plaza in his direction. The man entered the office and asked, "What's happening?" Mr. Collier, thinking that "maybe he had come in there to talk to somebody about a car," did not reply but continued counting. Suddenly the man stuck a gun in Collier's side and demanded money. Mr. Collier gave the robber all the money he was counting[2] and lay down on the floor as directed. The robber then walked out of the office, and Collier watched him as he headed across

---

1. D.C.Code §§ 22–2901 and 22–3202 (1989).

2. When Collier later checked the gauges on the gas pumps, he determined that the money the robber had taken amounted to "$326 and some change."

the plaza and disappeared behind a tow truck.

Mr. Collier immediately called 911 and gave a description of the robber over the phone. When several police officers came to the station a few minutes later, Collier again gave them a description of the robber and his gun. He told the officers that he had immediately recognized the robber as a man who had brought a black Audi into the station for repairs a couple of times and, some time earlier, had brought in a Cadillac as well. Collier also told the police that the Audi remained on the lot for over a month, and that one night—about a week before the robbery—the robber had asked him for the keys to the Audi and had gone to sit in it with a friend, listening to the radio, until after the station closed at midnight. Mr. Collier had also seen the robber frequently ("three or four times a week") before the robbery because "he used to hang out across the street at the shopping center."

Over the next few months, Mr. Collier saw the robber near the station on three occasions. The first two times he called 911 and gave a description of the man he had seen. Nothing happened after the first call. After the second call, however, the police picked up a suspect and brought him to the station for Collier to identify, but Collier told them it was the wrong man. Finally, on January 9, 1987, Collier saw the robber again. He immediately "went across the street and told [a police officer] that he was the guy that robbed the gas station." That officer broadcast a description over the radio, and about five minutes later appellant was arrested and brought back to the station, where Mr. Collier positively identified him.

On July 24, 1987, nine and a half months after the robbery, defense counsel sent a letter to the prosecutor requesting *inter*

*alia* copies of "any 911 calls and radio runs in this case." At a later hearing in November, it was established that the police department had failed to preserve a tape of the 911 call which Mr. Collier had made on the night of the robbery, in which he gave a description of the robber, and that the tapes of the two subsequent 911 calls could not be located. The prosecutor[3] told the court that "the whole tape" containing the first call had been erased in accordance with Metropolitan Police Department administrative procedures, under which 911 tapes were destroyed after one year. Defense counsel then filed a motion to impose sanctions under the Jencks Act,[4] asking the court to exclude the testimony of Mr. Collier because of the government's failure to preserve the tapes of the 911 calls.

The motions judge denied the motion for sanctions, finding (1) that there were three other documents from the night of the robbery which contained "descriptive information";[5] (2) that Mr. Collier knew the robber by sight because he had brought his car to the station well in advance of the robbery to have it repaired, and that appellant had admitted going to the station before the date of the robbery; and (3) that there was no showing of any "intentional or willful or malicious destruction of evidence to thwart a defense." The judge found no bad faith on the part of the government, although the loss or destruction of the tapes "may be said to be negligent...." The judge also denied defense counsel's alternative request for a missing evidence instruction "because of the peculiar facts of this case."

## II

■ By failing to produce Mr. Collier's 911 call from the night of the robbery and two subsequent 911 calls of sightings of the robber, the government violated the

---

3. The prosecutor at the November hearing (and at the ensuing trial) was different from the one to whom defense counsel had sent the July 24 letter. Some time between July and November the case had been reassigned from one prosecutor to another.

4. 18 U.S.C. § 3500 (1988).

5. First, the information from the 911 call was summarized on a computer printout. Second, there was a recorded radio broadcast from that evening which contained at least part of the description that the police had obtained from Mr. Collier. Finally, there was an incident report, Form PD–251, incorporating Mr. Collier's description.

Jencks Act. That Act imposes an affirmative duty upon the government to preserve "statements" of its witnesses [6] and, upon motion of the defendant, to disclose and produce those statements. "This duty extends not only to the prosecutor, but to the government as a whole, including its investigative agencies." *Montgomery v. United States*, 384 A.2d 655, 662 (D.C.1978) (citations omitted). There can be no doubt that the government, as the motions judge found, was negligent.

■ We are deeply disturbed by the indifference shown by the government in its failure to preserve discoverable evidence. It is especially troubling that defense counsel made a specific request for the 911 calls in July, well in advance of the scheduled October destruction date. Counsel's letter to the initially assigned prosecutor, which is in the record, could not have been more explicit. It appears, however, that the prosecutor did absolutely nothing to comply with his duty to preserve the tapes and make sure that they were not destroyed. This is unacceptable.[7] A prosecutor is not free to ignore a discovery request for such tapes when he knows (or should know) that the tapes will soon be destroyed in accordance with established procedures. At the very least, the prosecutor should have picked up the phone and called the records section of the police department as soon as he received defense counsel's letter. In that call he should have asked the police to set aside the tapes of the several 911 calls which the defense had requested and not to erase them as it would otherwise do in the

normal course of business.[8] The purpose of the Jencks Act is "to aid in the search for truth by permitting access to prior statements of government witnesses for possible impeachment." *Fields v. United States*, 368 A.2d 537, 539 (D.C.1977) (citations omitted). That purpose is frustrated when the government, through negligence or indifference, allows potential Jencks Act statements to be needlessly destroyed or lost.

■ Nevertheless, a violation of the duty to preserve which results in the loss of discoverable statements does not automatically require the imposition of sanctions. *Gibson v. United States*, 536 A.2d 78, 84 (D.C.1987); *Bartley v. United States, supra* note 6, 530 A.2d at 697. Ever since *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), the rule has been that "the administration of the Jencks Act must be entrusted to the 'good sense and experience' of the trial judges subject to 'appropriately limited review of appellate courts.' " *Id.* at 355, 89 S.Ct. at 533, quoting *Palermo v. United States, supra* note 6, 360 U.S. at 353, 79 S.Ct. at 1225. The decision whether or not to impose sanctions for Jencks Act violations, as well as the choice of sanctions, is within the trial court's discretion. Its decision either way will not be overturned on appeal unless the appellant can show that this discretion has been abused. *Jones v. United States*, 535 A.2d 409, 411 (D.C.1987); *Montgomery v. United States, supra*, 384 A.2d at 662.

6. The Jencks Act covers not only written statements made by a witness "and signed or otherwise adopted or approved by him," 18 U.S.C. § 3500(e)(1), but also "a substantially verbatim recital of an oral statement made by [the] witness and recorded contemporaneously with the making of such oral statement...." *Id.* § 3500(e)(2). "The transcription must be a continuous, narrative recording rather than mere selective notations or excepts from the oral statements." *Moore v. United States*, 353 A.2d 16, 18 (D.C.1976), citing *Palermo v. United States*, 360 U.S. 343, 351–352, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959). We assume here, as we did in *Bartley v. United States*, 530 A.2d 692, 697 n. 10 (1987), that tape recordings of 911 calls fall within the Act's definition of "statements."

7. We note that the request for the 911 tapes was made in a single sentence in a four-page letter requesting production of a wide range of discoverable materials. Our complaint is not that the prosecutor might have been a little slow in responding to the letter, which would have been understandable, given the massiveness of counsel's request, but that he failed to respond at all.

8. We emphasize that our criticism is not directed at the trial prosecutor, Ms. Leary. By the time the case was assigned to her, the damage had already been done by her predecessor (whose name does not appear in this opinion), and there was nothing she could do to repair it.

■ When a Jencks Act statement has been lost or destroyed, the trial court must consider several factors in deciding what sanctions, if any, to impose:

(1) who within the government is responsible for the loss or destruction; (2) whether the loss or destruction was deliberate, done for an improper purpose, negligent or inadvertent; (3) the extent to which the government has promulgated and generally followed procedures designed to preserve evidence ...; (4) whether the applicable procedures were followed in the particular case; and (5) what steps were taken by the government to locate or reconstruct the missing evidence when its loss was discovered.

*United States v. Jackson*, 450 A.2d 419, 426 (D.C.1982) (citations omitted). The motions judge in this case took these factors into account. In particular, he considered that the 911 tapes were erased pursuant to established police department procedures, and concluded that although the government was negligent in its failure to preserve them, there was no bad faith or willful misconduct. The trial court's determination of the degree of negligence involved in the loss of a statement is a finding of fact and cannot be overturned on appeal unless it is clearly erroneous. *Jones v. United States, supra*, 535 A.2d at 411. The record supports the finding that the government's failure to produce was the result of negligence, but not gross negligence or willful misconduct. Appellant has not shown that the motions judge, having heard the relevant facts (which were essentially undisputed), abused his discretion in deciding not to impose sanctions under the Jencks Act.

After the motion for sanctions was denied, the case was reassigned to a different judge for trial. We find no abuse of discretion by the trial judge with respect to the Jencks Act issue. Although appellant now contends that the substitute documents (see note 5, *supra*) were an inadequate reconstruction of the 911 call, his counsel did not renew at trial the request for Jencks Act sanctions. Consequently, since the trial judge's discretion was never invoked, we cannot say that it was abused.

Moreover, the trial testimony of Detective Robert Good of the Robbery Squad was, in large part, the equivalent of a substitute document because it substantially matched Mr. Collier's testimony. Detective Good interviewed Mr. Collier on the night of the robbery and obtained from him a detailed description of the robber. "Documents which substantially incorporate notes or records of oral statements of a witness may satisfy the production requirement of the [Jencks Act] depending on the reliability of the reporting process and the absence of prejudice to the defendant." *Moore v. United States, supra* note 6, 353 A.2d at 18 (footnote omitted). Although Detective Good's testimony was obviously not a "document," it was based on the notes he took during his interview with Mr. Collier, and those notes were made available to defense counsel pursuant to the Jencks Act.

In any event, in deciding whether sanctions should have been imposed, we must consider the relative importance of the lost or destroyed statements and the degree of prejudice resulting from the loss. *See Bartley v. United States, supra* note 6, 530 A.2d at 697. In this case it is highly significant that Mr. Collier remembered the robber as the same man who had brought in not only a Cadillac but, later, an Audi for repairs. Collier also recalled that the man had left the Audi at the station for a month. In addition, Collier had seen the robber three or four times a week before the robbery, hanging out at the shopping center across the street. From these facts, all of which were made known to the police on the night of the robbery, we can safely conclude that the description that Collier gave to the police in the 911 call was of little or no evidentiary value. Collier's identification of appellant at trial was based primarily, if not entirely, on these prior encounters. Hence any prejudice which appellant may have suffered from the loss of the tapes was minor, and not of a degree sufficient to require the exclusion of Collier's testimony.

■ Appellant alternatively contends that the trial judge should have imposed

the less severe sanction of a missing evidence instruction, which would have allowed the jury to infer that the lost 911 calls would have been unfavorable to the government. *See Jones v. United States,* 343 A.2d 346, 352 (D.C.1975), suggesting "a variant of the so-called missing witness instruction," and citing *United States v. Bundy,* 153 U.S.App.D.C. 191, 194, 472 F.2d 1266, 1269 (1972) (Leventhal, J., concurring). Assuming that such an instruction might have been appropriate, it was never requested at trial,[9] and the trial judge was under no duty to give it *sua sponte. See Allen v. United States,* 495 A.2d 1145, 1150 (D.C.1985) (en banc); *Johnson v. United States,* 387 A.2d 1084, 1088 (D.C.1978) (en banc); *cf. Thorne v. United States,* 582 A.2d 964, 965 (D.C.1990) (when pendency of pre-trial motion for severance was never brought to trial judge's attention, trial judge "could not reasonably be expected to sever the counts *sua sponte*").

■ We close this section of our opinion by focusing the spotlight on the words of the United States Court of Appeals for the District of Columbia Circuit more than twenty years ago in *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642 (1971):

> [S]anctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced, and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation.

*Id.* at 142, 439 F.2d at 652 (footnote omitted; emphasis in original). This court, in the years since *Bryant,*[10] has made several similar pronouncements. *See, e.g., United States v. Jackson, supra,* 450 A.2d at 425 (citing cases). Although the *Bryant* rule may be inconvenient or annoying, it is still the law, and prosecutors and police alike are bound by it. In this case the government was lucky because Mr. Collier knew

the robber from several prior encounters, so that the description he gave in the 911 call was of minimal value in ensuring that the robber was properly identified. In some future case, however, with weaker evidence and a lost or destroyed Jencks Act statement, the government may not be so fortunate. The government has an affirmative duty under *Bryant* to preserve *all* discoverable evidence. Although its breach of that duty in this case was not fatal, a similar breach in another case may well lead to reversal.

### III

Appellant also contends that the trial court abused its discretion in admitting testimony that he slept in his car while it was being repaired at the station, and that on one occasion he took back $50 he had previously paid in advance for repairs to his car. Appellant asserts that the government presented this evidence to establish his poverty as a motive for the robbery; the government responds, however, that it was offered simply to corroborate Mr. Collier's identification of appellant as the robber. We agree with the government and the trial court that this evidence was relevant to the issue of identity.

■ Testimony about a defendant's poor financial state is generally not admissible to prove a motive for robbery or theft because its prejudicial effect outweighs its probative value. *Davis v. United States,* 133 U.S.App.D.C. 167, 171, 409 F.2d 453, 457 (1969). Before such evidence may be admitted, there must be "something more than a general suspicion that because a person is poor, he is going to commit a crime." *Vitek v. State,* 295 Md. 35, 41, 453 A.2d 514, 517 (1982) (internal quotation marks omitted). Nevertheless, such evidence may be admissible for another purpose "under special circumstances." *Id.* We need not decide whether such circumstances were present in this case, because we are satisfied that if there was any prejudice, it was cured by the trial judge.

**9.** The only request for a missing evidence instruction was made at the pre-trial hearing on the motion for Jencks Act sanctions, which was held before a different judge. The request was not renewed before the trial judge.

**10.** *Bryant* is binding on this court under *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

The testimony that appellant slept in his car at the station and that he could not pay for the repairs to the car corroborated Mr. Collier's identification of appellant as the robber. Because identity was the sole contested issue, "it was crucial that both parties be afforded every reasonable opportunity to adduce at trial evidence pertinent to the credibility of the witnesses." *Davis v. United States, supra*, 133 U.S.App.D.C. at 169, 409 F.2d at 455. The challenged evidence corroborated Collier's testimony that appellant frequented the station and that on one occasion he gave appellant the keys to his car just before closing time.[11] The trial judge was alert to the potential for prejudice and cautioned the prosecutor not to elicit any testimony "that is going to have as its primary probative impact that Mr. Slye is a bum that sleeps in cars around the gas station." When Cedric Harrison, another employee of the service station, then testified that he saw appellant sleeping in his car, the prosecutor elicited further testimony that Collier had told Harrison that the robber was "the guy that slept in the car," which Harrison had already identified as a black Audi. At that point the court gave a limiting instruction:

> [Y]ou may only relate that information about Mr. Slye sleeping in the car to the issue of identity. It has absolutely no relevance in suggesting that he's an undesirable person, or because he sleeps in the car, that he's the type of individual that would commit a robbery. That is not a permissible inference to be drawn from that evidence.

Every jury is presumed to follow the court's instructions, *e.g., Hairston v. United States*, 497 A.2d 1097, 1103 (D.C.1985), and there is nothing in the record to suggest that this jury failed to do so. Since the instruction given was sufficient to overcome any prejudice, we find no reversible error.

*Affirmed.*

---

11. The keys apparently were never returned.