**Jeffrey COOK, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 02–CM–307.**

District of Columbia Court of Appeals.

Argued June 11, 2003.

Decided July 10, 2003.

---

■■■■■■■■■■■■■■■■■■■■■■

Susan H. Rosenau, Washington, DC, appointed by the court, for appellant.

Gilbert O. Guerrero, Jr. Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before REID and WASHINGTON, Associate Judges, and KERN, Senior Judge.

REID, Associate Judge:

■■■ After a bench trial, appellant Jeffrey Cook was convicted of simple assault, in violation of D.C.Code § 22–504 (1996).[1] He filed a timely appeal primarily raising contentions relating to (1) the Jencks Act, 18 U.S.C. § 3500, and (2) *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[2] We conclude that the trial court did not commit reversible error with regard to *Brady.* However, we vacate Mr. Cook's conviction and remand this case to the trial court for a proper Jencks Act inquiry regarding notes taken by the police officers at the time of the assault.

## FACTUAL SUMMARY

The government presented its case through the testimony of complaining witness, Marcel Forrest. At the time of the incident at issue in this case, Mr. Cook and Ms. Forrest lived in the same apartment building, located in the 1500 block of 25th Street, Southeast, in the District of Columbia. Mr. Cook's girlfriend and his witness, Latisha Green, also resided in the same building.

On June 19, 2001, Mr. Cook assaulted Ms. Forrest by punching and kicking her in the head, face and back with his boots (Timberland with a steel toe) for about ten minutes. The assault grew out of a conversation between Mr. Cook and another man in the afternoon during which the other man accused Mr. Cook of taking money from Ms. Forrest's apartment.[3]

---

1. Recodified at D.C.Code § 22–404 (2001).

2. He also asserts reversible error because of the trial court's admission of evidence of allegedly prior bad acts, in violation of *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964). However, the record on appeal does not show that the trial court relied on the challenged acts in rendering its decision, and that at any rate, because Mr. Cook was tried by the court rather than a jury, if any error occurred, it was harmless. Judges are presumed to know the law, *see Singletary v. United States,* 519 A.2d 701 (D.C.1987), and therefore admission of the challenged acts would not have resulted in the reversal of Mr. Cook's conviction. As we said in *Singletary:* "Since there is a presumption that a trial judge, in deciding a case, will disregard any inadmissible evidence and any improper argument, we could not possibly find reversible

error here, even … assum[ing error]…." *Id.* at 702 (citations omitted).

3. About one week prior to June 19, Ms. Forrest planned to have a cable television hookup in her apartment. Mr. Cook informed her that he had a cable installation at no cost and "offered to hook-up illegal cable" in her apartment as well. Ms. Forrest declined the offer, and arranged for her own hook-up installation. When the cable company installed her hook-up, they disconnected Mr. Cook's illegal hook-up. Afterwards, Mr. Cook asked Ms. Forrest why she and her roommate told "the … cable man to disconnect his cable." A few days later, Ms. Forrest discovered that $500 was missing from her apartment and her television had been "broken [and] … had water damage." Since she had no proof that Mr. Cook was the culprit, the police did not file a report.

Ms. Forrest overheard the accusation as well as Mr. Cook's denial that he had taken the money; saw him kick the lawn chairs; and listened to his threat that if Ms. Forrest were a male, he would "punch [her] in [her] face."

Later, around 9:45 p.m. on June 19, Ms. Forrest returned home. She noticed Mr. Cook "was sitting outside" as she pulled up in her car. He went into the apartment building upon seeing her. Ms. Forrest then "got out of [her] car, . . . walked into the building and . . . walked up the stairs to [her] apartment." She was attempting to unlock the door to her apartment when "[Ms.] Green grabbed [her] by the back of [her] head and started punching [her] in [her] face." Ms. Forrest described the subsequent events as follows:

> We stumbled down the first set of stairs, and [Ms. Green] was punching me in my face, and [Mr.] Cook came out of his apartment and stood over top of us, and was screaming get her . . . . You're going to tell people I stole your money . . . . [G]et her . . . .
>
> He then started kicking me in the face . . . . He started stomping me in my face and punching me with his Timberlands which are steel toe boots. He was punching me in my face, kicking me in the back of my head, kicking me in my back. Just all areas of the upper part of my body.

Ms. Forrest suffered a "cut" over her left eye, "a black eye on one eye, . . . bruises all over [her] back to the middle of [her] back, . . . scrapes and cuts all on [her] back and . . . neck area." "When the police arrived, they saw that [Ms. Forrest] had . . . blood—not gushing blood, but they saw that [she] had injuries." An ambulance was called and she was treated at the scene with "ice packs and . . . [was given] gauze and bandages." Mr. Cook and Ms. Green fled the scene before the police arrived, and Ms. Forrest provided the officers with their description.

Ms. Green and Mr. Cook testified for the defense. Mr. Cook depicted Ms. Forrest, with whom he said he had an intimate relationship in the past, as jealous of Ms. Green, his current girlfriend. Both Ms. Green and Mr. Cook claimed that Ms. Forrest initiated the attack and was the aggressor. Mr. Cook heard the women's voices and "thumping coming down the stairs." He saw them "land" at the foot of the stairs, and decided to put a baseball bat inside another tenant's apartment to keep it away from the struggling women. He then returned to try to break up the fight. He stated that he saw no blood on Ms. Forrest and no injuries to her person, but that there was an old scar or mark over one of her eyes.

In her trial testimony, Ms. Green declared that she saw Ms. Forrest in the stairway of the apartment building, and inquired why a man who had identified himself as Ms. Forrest's boyfriend, had threatened to kill Mr. Cook for taking money from her apartment, and the same man had said Mr. Cook should "stay out of [Ms. Forrest's] face." Ms. Forrest was on her cell phone when Ms. Green spoke to her, and she "hit [Ms. Green] with it . . . ." The two women struggled and fell down the stairs. Ms. Green saw no blood on Ms. Forrest and no injuries. She, too, indicated that Ms. Forrest had had a scar above her left eyebrow for at least two years.

In rendering judgment, the trial court declared that it had to "resolve the credibility issues vis-a-vis the people who have testified." The court found "[Ms.] Forrest to be very believable." In contrast, "[t]here were several things about . . . [Ms.] Green's testimony that troubled [the court]," including inconsistent statements and the incredible nature of part of her testimony. The court discounted the testi-

mony of Mr. Cook, in part, because he allegedly engaged in actions that a reasonable person would not do under the circumstances, such as "going to a different floor [to] put a bat away" while presumably "trying to come to the aid of [Ms.] Green because [she] was being attacked" by Ms. Forrest.

## ANALYSIS

### The Police Notes and the Jencks Act

■ Mr. Cook first contends that "the trial court committed reversible error and abused its discretion when it failed to strike the testimony of the government witness who testified about *Jencks* [4] materials, after the materials were not made available at trial." Specifically, he complains that the trial court permitted Ms.

Forrest's testimony to stand, even though notes made by the police officers regarding her statement at the time of the June 19 incident were not produced by the government. He claims prejudice in that he could not impeach the government's sole witness with statements made contemporaneously with the assault on her. He also faults the trial court for not imposing sanctions on the government.

This case presents an unusual set of circumstances with respect to Mr. Cook's Jencks Act claim. Even though the government subpoenaed or "CANS'd" the police officers, who investigated the assault of Ms. Forrest, to appear in court, they did not do so; and the trial proceeded as though nothing unusual had occurred, despite defense counsel's specific request for the notes.[5]

---

4. Jencks Act, 18 U.S.C. § 3500, which is embodied in Super. Ct.Crim. R. 26.2, providing in pertinent part:

    (a) *Motion for production.* After a witness other than the defendant has testified on direct examination, the Court, on motion of a party who did not call the witness, shall order the prosecutor ... to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

    . . .

    (e) *Sanction for failure to produce statement.* If the other party elects not to comply with an order to deliver a statement to the moving party, the Court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the prosecutor who elects not to comply, shall declare a mistrial if required by the interest of justice.

5. Just before Mr. Cook's trial began, the government attorney advised the trial judge that the officer's notes had been taken but were not in the case jacket for Mr. Cook. The prosecutor added: "The officers were CANS'd to be here today, and they haven't shown up and we don't have the notes." The trial judge said: "I'll hear any argument from [defense counsel] assuming they are in fact

Jencks for the witness. Make your opening statement, sir." The government then proceeded with its opening statement. After the government completed its direct examination of the complaining witness, defense counsel said: "Jencks?" The prosecutor responded: "With regard to the Jencks request, I think we turned over in discovery all the police reports and we *don't have the officer's notes.*" The defense cross-examined the complaining witness, Ms. Forrest.

During his cross-examination of Ms. Forrest, and after establishing that the police had made notes on what she said to the officers, defense counsel renewed the Jencks request. The trial court stated: "I understand that the government does not have what was written for the witness which would be the identification. I'll take that into account later." The judge continued, "I don't know what else the government can do. I understand the government inquired and the officer cannot find any notes; is that correct?" The prosecutor corrected the trial judge by saying: "I believe what happened was we had the officers who were supposed to come here." The trial court replied: "Well, that's right. You said the officer was CANS'd and has not even come." When the prosecutor said, "Exactly," the trial judge responded: "I'll assume that the notes are lost and I'll hear your [defense

The government did not suggest even a momentary delay for the purpose of contacting the officers to determine why they had not reported to court, or when they might be available. Nor did defense counsel request a continuance to allow time for the officers to turn over their notes. And, when it became clear that the government would not produce the notes, Mr. Cook's counsel did not move for sanctions, even though the trial court specifically stated: "I'll assume that the notes are lost and I'll hear your request for sanctions later." Nor did the trial court revisit the issue before rendering a decision.

There is some indication that the trial court regarded the central task in this simple assault matter to be a determination of credibility, since the case involved an intense, apparently deep-seated interpersonal conflict among the three witnesses at trial, all of whom resided in the same apartment building, and two of whom had had an intimate relationship with Mr. Cook. Because the government's case hinged on the testimony of a single witness, and both defense witnesses gave accounts at odds with that of the government witness, however, the officers' notes would have aided the court's credibility assessment, and eliminated any due process concerns.

Our past approach to cases concerning Jencks Act issues has resulted in precise legal standards and principles designed to safeguard a defendant's right to a fair trial, including access to documents with which a government witness may be impeached. Those standards impose obligations on the government, defense counsel, and the trial court, which are grounded in the Jencks Act and the corresponding Super. Ct.Crim. R. 26.2.

Both the Jencks Act, 18 U.S.C. § 3500(b) and (d), and Super. Ct.Crim. R. 26.2(a) and (e) require the government, upon motion by the defendant, to produce any statement, in its possession, of a government witness who testifies against the defendant; and if the government fails to comply with an order to produce such statement, the court "shall" strike the testimony of the witness. *March v. United States*, 362 A.2d 691 (D.C.1976) expounds upon the requirements that must be met under the Jencks Act.

■ In *March,* a police detective made notes on a 3x5 inch card of the general description of the suspect. The government did not produce the detective's notes at trial in accordance with the dictates of the Jencks Act.[6] The trial court declined to strike the testimony of the complainant or the detective who made the notes. Neither party in *March* challenged the assumption that the detective's notes constituted Jencks material.[7] Nevertheless, we em-

counsel's] request for sanctions later." No request was made. At the beginning of its decision in this matter, the trial court asserted:

[A]s a preliminary matter I understand that the government was not able to obtain other witnesses that they had subpoenaed or CANS'd, in the local vernacular, police officers to come in and they did not respond today and they did not locate photographs that were taken, but I think that does not mean that the government cannot make its case beyond a reasonable doubt. What I

have to do is resolve the credibility issues vis-a-vis the people who have testified.

6. "Under the Jencks Act, a party is required to produce at trial any 'statement' by a government witness." *Lee v. United States,* 699 A.2d 373, 388 n. 31 (D.C.1997). "In pertinent part, the Act defines a 'statement' as 'a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement ....' 18 U.S.C. § 3500(e)(2)." *Id.*

7. Some of our past cases have focused on whether notes made by police officers are

phasized that "the necessary initial question [is] whether the detective's card fell within the narrow limits of the Jencks Act at all." *Id.* at 697.[8] Here, the parties and the trial court ultimately referred to the detectives' notes as Jencks Act material, even though the trial court initially did not squarely find that they fell under the Jencks Act. Rather, the court implicitly concluded that the notes fell within the ambit of the Jencks Act, and then "assumed" that they were lost.

■ We declared in *March, supra,* that: "Where a discoverable statement has been lost or destroyed and hence is not in the government's possession, a trial court must weigh certain factors [e.g., the actions of the officer[s] and the potential prejudice to the accused] in exercising its discretion whether to strike a witness' testimony." *Id.* at 697 n. 7 (citation omitted). The trial court did not weigh these factors,[9] nor did either government or defense counsel remind the court to do so. While "the loss of discoverable Jencks Act statements 'does not automatically require the imposition of sanctions,'" *see Lee, supra* note 6, 699 A.2d at 389 (quoting *Slye v. United States,* 602 A.2d 135, 138 (D.C. 1992) (other citations omitted)), the Jencks Act requires that trial judges determine whether a sanction should be imposed, in the exercise of their discretion.

Here, the trial court recognized that sanctions should be considered, but never did do so. The decision to impose sanctions in this case may well depend upon whether the police notes merely contained identifying information such as the weight and height of Mr. Cook and Ms. Green, or whether they contained "a substantially verbatim recital of an oral statement made by [Ms. Forrest] and recorded contemporaneously with the making of such oral statement ...." *Moore, supra* note 7, 353 A.2d at 18 n. 4 (quoting 18 U.S.C. § 3500(e)(2)).

What we said in *(Carlton) Moore v. United States,* 657 A.2d 1148 (D.C.1995), is applicable to this case: "The trial judge could not determine whether the notes were substantially verbatim, nor could counsel make such a showing, unless they were produced in court for the judge to examine." *Id.* at 1151. It was the prosecutor's burden to produce the notes. *Id.* "The burden is not upon the defendant to prove that the statements requested are substantially verbatim recitals within the meaning of the [Jencks] Act." *Id.* (citation omitted). "All that the defense has to establish is reason to believe that a statutory 'statement' may exist." *Id.* (citation and other internal quotation marks omitted).

---

Jencks material. For example, in *Lee, supra,* we concluded that at least some of the police notes fell outside of the Jencks Act because the detective had jotted down only topics to be covered during the interview. *Lee,* 699 A.2d at 389. The descriptive notes in *March, supra,* stated: "Negro male 16–25 years of age. Slim build, 5'8" to 5'9". Black leather three-quarter length jacket and dark trousers," did not fall under the Jencks Act. *Id.* at 697. Other police notes cases are cited in *Lee, supra,* 699 A.2d at 389, including *(Calvin) Moore v. United States,* 353 A.2d 16 (D.C. 1976), where we said that to qualify as Jencks material, police notes "must be a continuous, narrative recording rather than mere selective

notations or excerpts from the oral statements." *Id.* at 18.

**8.** We also stated in *March, supra:* "[W]here ... the sole authority for the disputed action of the trial court rests upon statutory provisions, any proper resolution of challenges to the manner in which the statute was applied necessarily includes inquiry as to whether the statute should have been applied at all." *Id.* at 697–98 n. 7.

**9.** For a listing of other factors to be considered by the trial court, *see United States v. Jackson,* 450 A.2d 419, 426 (D.C.1982).

We are mindful of the fact that "the administration of the Jencks Act must be entrusted to the 'good sense and experience' of the trial judges subject to 'appropriately limited review of appellate courts,'" *Id.* at 1150 (quoting *United States v. Augenblick*, 393 U.S. 348, 355, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969) (other citations and internal quotation marks omitted)); *see also United States v. Montgomery*, 478 A.2d 1088, 1092 (D.C.1984). But we also recall that "we have frequently complained of the indifference shown by the government in its failure to preserve discoverable evidence," *Lee, supra* note 6, 699 A.2d at 389 (internal quotation marks and citation omitted). The indifference in this case is inescapable, not only because the government did not produce the police notes, but also because the subpoenaed police officers did not appear in court and there was no explanation for their absence, and no apparent effort to contact them. And, it is surprising, with respect to the administration of the Jencks Act, that defense counsel neither followed through on his request for the police notes, nor accepted the trial court's invitation to be heard on the issue of sanctions. After all, "[t]he purpose of the Jencks Act is 'to aid in the search for truth by permitting access to prior statements of government witnesses for possible impeachment.'" *Williams v. United States*, 757 A.2d 100, 107 (D.C. 2000) (quoting *Fields v. United States*, 368 A.2d 537, 539 (D.C.1977) (other citation omitted)).

On this record, then, because the requirements of the Jencks Act and Super. Ct.Crim. R. 26.2, as set forth in our case law, were not met, we are constrained to remand this matter to the trial court for the proper Jencks inquiry. Unlike the situation in *Moore, supra*, where we concluded that "any error was harmless," 657 A.2d at 1152, Mr. Cook did not have other Jencks Act statements with which to impeach a government witness, nor was there testimony from other government witnesses to corroborate that of Ms. Forrest, the government's only witness. On remand, the trial court may find helpful the guidance which we set forth in *Johnson v. United States*, 800 A.2d 696, 701 (D.C.2002), another case involving the Jencks Act.

### The Photographs and Brady v. Maryland

Similar to the situation with the police notes, there were system failures with respect to the photographs taken at the scene of the assault. Ms. Forrest testified that the police took about 8–10 pictures of her face, shoulder and back area in her apartment, with a flash camera that was not a polaroid. She removed her shirt for the pictures. When defense counsel requested production of the photographs under *Brady, supra*, the government informed the court that: "We never received photographs from the crime scene people. We normally do receive them. We didn't receive them in this case." The trial court said: "[T]here's no reason to believe there is anything exculpatory in it— and the prosecutor responded, 'no.'" The trial court added: "[B]ut in any event I think it prejudices the government by not having it and not the defense." In response to the court's question, "have you made all the efforts you can to find them," the prosecutor answered, "Yes, we have."

Mr. Cook asserts that "the trial court abused its discretion when it failed to sanction the prosecutor for not disclosing photographs of [Ms. Forrest], taken at the scene as required by *Brady*, [*supra*]." He states that "it is unclear from the record whether defense counsel made a *Brady* request before trial." Nevertheless, he seeks a remand to determine whether the photographs were material to his defense

because they "could have gone a long way towards helping to determine the credibility of all three witnesses." The government maintained that it "never received the photographs from the crime scene people" and that it had "made all the efforts [it could] to find them."

■■■ "*Brady* and its progeny require the government to disclose to the defense, upon request, evidence in its possession that is 'material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Farley v. United States*, 694 A.2d 887, 889 (D.C. 1997) (quoting *Brady, supra,* 373 U.S. at 87, 83 S.Ct. 1194). Moreover, "even when the prosecution may not know about certain evidence, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Id.* at 889 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). As the court said in *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971): "The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies." Failure to disclose evidence that is material either to guilt or to punishment results in a violation of a defendant's due process rights. *See Boone v. United States*, 769 A.2d 811, 819 (D.C.2001). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Farley, supra,* 694 A.2d. at 889 (citations omitted).

On this record, Mr. Cook has not made the required showing of materiality. As we said in *Robinson v. United States*, 825 A.2d 318 (D.C.2003): "There is no *Brady* violation absent a showing of materiality, *i.e.,* that the missing evidence 'would have made a different result reasonably probable.'" *Id.* at 325 (quoting *Farley, supra,* 694 A.2d at 889 (other citation omitted)). Furthermore, *Brady* does not require us to speculate about the "exculpatory value" of the photographs. We discussed this precise point in *Robinson, supra.* We said: "In *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court held that in cases where the exculpatory value of the evidence is unknown, 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Robinson, supra,* at 325 (quoting *Arizona, supra,* 488 U.S. at 58, 109 S.Ct. 333).

Mr. Cook had at least two opportunities to show bad faith on the part of the government or to establish the materiality of the photographs. The first was when the government responded, "Yes, we have," to the court's question: "Have you made all the efforts you can to find the photographs[?]" He could have requested details regarding the government's efforts to locate the photographs. The second opportunity arose during the trial court's inquiry about the photographs. The judge made the statement: "[T]here's no reason to believe there is anything exculpatory in [the photographs]." The prosecutor agreed. Defense counsel made no comment at all, but could have explored how that determination was made in the absence of the photographs. In short, Mr. Cook did not sustain his burden to show materiality, or that the photographs would have made a different outcome in his case reasonably possible. Consequently, there is no basis for reversing his conviction on *Brady* grounds.

For the foregoing reasons, we reject Mr. Cook's argument that his conviction should be reversed on *Brady* grounds. However, we vacate his conviction and remand this matter to the trial court for a proper Jencks Act inquiry regarding notes taken by the police officers at the time of the assault.

*So ordered.*