**Marquita Y. KING and Neal W. King, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 09–CF–309, 09–CF–361.**

District of Columbia Court of Appeals.

Argued Dec. 1, 2011.
Decided Sept. 6, 2012.

---

**33.** *See id.* at 845.

Peter H. Meyers for appellant Marquita King.

Stefanie Schneider, Public Defender Service, with whom James Klein and Samia Fam were on the brief, for appellant Neal King.

Magdalena Acevedo, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, Mary B. McCord, and B. Michael Ortwein III, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and OBERLY, Associate Judges, and NEBEKER, Senior Judge.

GLICKMAN, Associate Judge:

Appellants, Neal King and Marquita King,[1] were convicted of charges that arose from the shooting of Anthony Jackson. Neal King contends the trial court erred in admitting Jackson's statement to a police officer at the crime scene that he knew it was Neal who had shot him "because he tried to rob my brother." Marquita King argues that the court abused its discretion in denying her severance motion and that there was insufficient evidence to support her conviction on one count of felony threats. We affirm appellants' convictions.

## I. Factual Background

### A. Attempted Robbery and Shooting

Neal King was convicted of assault with intent to kill while armed and related gun charges. The government presented evidence that on November 24, 2007, Kevin Simon, who was Anthony Jackson's older brother, was walking through the Wingate apartment complex on his way home when he saw a few young men he knew. One of

---

1. Because appellants share the same surname, we sometimes refer to them in this opinion by their first names rather than their last name.

them was Neal King. After they exchanged greetings, Simon walked on, but Neal caught up with him and told Simon he had some clothing he wanted to sell to him. Simon testified that Neal led him to a nearby vacant apartment, supposedly to show him the goods. Once there, however, Neal pulled out a handgun, pointed it at Simon, and told him to empty his pockets. Fortunately for Simon, his friend Troy Souder happened to appear and told Neal to stop. Neal put the gun down without taking any of Simon's property, and Simon left and walked home. When he arrived there, he told his brother Jackson that Neal had just tried to rob him. Jackson, who also was acquainted with Neal, responded that he "was going to go down there and talk to [Neal]." Simon did not report the attempted robbery to the police at that time; he first told them about it approximately one month later, when they interviewed him about the shooting of his brother.[2]

Jackson testified that after his brother told him Neal had tried to rob him, he immediately went to the Wingate apartment complex to look for Neal. Jackson found him standing with a few other people and confronted him about having "mess[ed] with" Simon. Neal responded angrily and told Jackson to "get . . . to the cut" (a nearby portion of the courtyard). Although Jackson could see a gun tucked into Neal's waistband under his shirt, he accompanied Neal alone to the cut. As the two stood facing each other, Jackson related, Neal pulled out the gun and shot him several times.

The first person to come to Jackson's aid was Marcus Clark, the residential service manager at the Wingate. Clark testified that he heard the gunshots, he looked out from his office, and saw several young men running away. The only one of them he recognized was Neal. He described Neal as running with one arm pressed up against his stomach or waistband area. Clark testified that when he reached Jackson, Jackson said he "was about to die" and "[didn't] know why Neal shot him."

Officer Milton Gilchrist, the first police officer on the scene, arrived to find Clark administering first aid to Jackson, who was lying on the ground. Gilchrist testified that he asked Jackson who shot him, and Jackson responded, "Neal." Jackson was "wincing in pain" and told Gilchrist "that it hurt." Gilchrist asked Jackson what Neal's last name was, but Jackson said he did not know.

After Gilchrist gave this testimony, the prosecutor requested a bench conference, during which he told the court that he wished to elicit from the officer that Jackson also said, "He [i.e., the shooter] tried to rob my brother." The prosecutor stated he "particularly" wanted to introduce this testimony to undercut the defense theory that Jackson and Simon had fabricated the story of the attempted robbery. The court responded that it would permit Gilchrist to testify to the statement because it was "part of the prior identification and puts the statements in context." Neal's counsel objected "for the record," but he did not articulate any basis for excluding the statement or request a limiting instruction.

Gilchrist then testified that he asked Jackson how he knew it was Neal who shot him, and Jackson responded, "Because he

---

**2.** Along with the charges relating to Jackson's shooting, Neal was charged with having assaulted Simon with intent to commit robbery while armed and a corresponding count of possession of a firearm during a crime of violence. Both those counts ultimately were dismissed after the jury could not reach a verdict on them and the government consented to Neal's motion for a mistrial.

tried to rob my brother." When Jackson was asked about this statement at trial, he did not remember having made it or even having spoken to Gilchrist.

Taking the stand in his own defense, Neal testified that on the day of the shooting, he had stopped to chat with a group of young men at the Wingate, including Troy Souder, when Jackson approached the group. Someone in the group (not Neal) insulted Jackson. Jackson became angry and questioned Neal as to why he was messing "with his man." Neal, who at trial denied having robbed Simon, responded that he did not know what Jackson was talking about. Unable to mollify Jackson, Neal invited him to "step in the cut" for what he thought would be a fist-fight. The two went to the cut, followed by others in the group, who were "egging [them] on" and "amping up the situation." Neal testified that he was unarmed. He and Jackson had their fists up when Jackson moved like he was unzipping his jacket or reaching for something. The next thing Neal knew, he heard shots. He turned around to see Troy Souder shooting at Jackson. Neal fled the scene.

The government called Souder to the stand in its rebuttal case. He denied shooting Jackson or even having been at the Wingate at the time of the shooting. Earlier that day, though, Souder said, he was at a party in a vacant apartment when Neal and Simon arrived. Simon was Souder's friend. When he heard Neal tell Simon to "give him everything in his pockets" and saw Neal wave a gun at Simon, Souder intervened, telling Neal, "I ain't

gonna let it go down" because "that's my man [*sic*] brother." Neal backed down, and Simon and Souder left. Souder did not report the robbery attempt to the police.

### B. Threats

Marquita King is Neal's cousin. The jury found her guilty of having feloniously threatened to injure Marcus Clark (the Wingate residential service manager).[3] Clark testified that on the morning of November 26, 2007, two days after the Jackson shooting, he was walking to his office when he saw Marquita, whom he recognized as a member of Neal's family. At trial, Clark recalled that Marquita said "[s]omething about Mr. Clark was a snitch" and "[s]omething about he's a bitch ass." In his grand jury testimony (which was introduced at trial and which he did not dispute), Clark remembered that Marquita said, "There's that snitch, Mr. Clark. We know where he lives at, and there's ways to keep snitches quiet." Clark told the grand jury that the comment "really disturbed the hell out of" him.[4]

Clark was impeached on cross-examination with a statement he had given to a defense investigator ten days before trial, in which he said he could not remember Marquita's exact words but was "confident it wasn't in the nature of a threat." Clark explained that the investigator had asked him about his present feelings, not his feelings at the time of the incident. Later in the trial, during the defense case, the investigator who took the statement testified that Clark was speaking about his

---

3. D.C.Code § 22-1810 (2001).

4. Detective Keith Batton testified that he met with Clark on November 26, and Clark told him that Marquita stated, "There go that snitch-ass Mr. Clark. We know where you live. We know how to keep you quiet." Batton went with Clark to help him collect his

belongings. He described Clark as seeming "like he wanted to get out of there fairly quickly." After Clark met with the police, he moved temporarily to Virginia and then to New York. He returned to Washington in February 2008.

feelings at the time of the alleged threat. And according to the investigator, Clark denied that Marquita ever said "we know where you live and we know how to deal with you or snitches."

## II. Neal King's Objection to the Admission of Jackson's Statement to Officer Gilchrist

■ Neal's sole claim on appeal is that the trial court erred in admitting Jackson's statement, recounted by Officer Gilchrist, that he knew Neal shot him "because he tried to rob my brother." The court admitted the statement under the hearsay exception for prior identifications. We review evidentiary rulings for abuse of discretion, but whether an out-of-court statement is admissible under an exception to the hearsay rule presents a question of law that we consider *de novo*.[5]

Under D.C.Code § 14–102(b)(3) (2001), "an identification of a person made after perceiving the person" is not hearsay, and is admissible as substantive evidence, so long as "the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement." We agree with the trial court that Jackson's statement qualified for admission under this provision.[6] In effect, after perceiving the person who shot him, Jackson identified him in two ways: not only as the person he knew as "Neal," but also as the person who (he believed) had tried to rob his brother. Even though Jackson had not perceived who, if anyone, had tried to rob Simon, that did not render the latter iden-

tifying statement inadmissible under the prior identification exception to the hearsay rule. Jackson's assertion that the shooter had robbed Simon was not admissible for the truth of that asserted fact; rather, it was admissible to " 'make the identification understandable to the jury' " [7] (and for any other relevant, non-hearsay purpose, as we shall discuss momentarily). The jury was well aware that Jackson had not witnessed the attempted robbery himself and had no personal knowledge of that alleged incident.

■ Neal complains that, in closing argument, the prosecutor relied on Jackson's statement to Gilchrist as substantive evidence confirming that Simon really did tell Jackson prior to the shooting that Neal had tried to rob him. Specifically, the prosecutor told the jury that

> [i]t all goes back to that statement ... "he tried to rob my brother." Mr. Jackson lying in that ditch bleeding, thinking he's going to die. The words off his lips when he thinks he's going to meet his Maker, do you really think[ ] he makes up he tried to ... rob my brother? Does that make any sense?
>
> \* \* \*
>
> [W]hen you focus first on what that young man said ... to Officer Gilchrist as he's lying there, "he tried to rob my brother," that is where the answer will be to this case. He didn't make it up then as he's fearing dying, and if he didn't make it up then, that means Kevin

---

**5.** *Brown v. United States*, 840 A.2d 82, 88 (D.C.2004).

**6.** The fact that Jackson did not recall making the statement when he was questioned about it at trial did not preclude its admission. *See Diggs v. United States*, 28 A.3d 585, 594–95 & nn. 13–14 (D.C.2011).

**7.** *Id.* at 595 (quoting *Brown*, 840 A.2d at 89); *cf. Lewis v. United States*, 996 A.2d 824, 829–30 (D.C.2010) ("Insofar as those statements went beyond mere identifications and included information about the crime itself, ... such information was needed to put the identifications in context and to clarify each appellant's individual role in the [crime]." (internal quotation marks omitted)).

Simon didn't make it up. In fact, he did tell his brother about that.

Neal never objected to this argument, however, and, in our view, it was not inappropriate. The prosecutor did not make impermissible hearsay use of Jackson's statement to Gilchrist; he did not urge the jury to consider it for the truth of the matter asserted, i.e., that Neal tried to rob Simon. Rather, from the mere fact that Jackson made the statement, the prosecutor asked the jury to infer a fact that Jackson did not assert in the statement: the fact, to which both brothers also had testified directly, that Simon told Jackson about the attempted robbery prior to the shooting. Asking the jury to draw that inference (certainly a plausible one in the circumstances) was not a hearsay use. It is no different from asking the jury to infer that Simon must have told Jackson about the robbery attempt from the fact that Jackson confronted Neal about it.[8] And non-hearsay evidence that Simon reported Neal's attempt to rob him before the shooting occurred was relevant and admissible as substantive evidence in this case: It refuted the defense claim that Simon falsely accused Neal of the robbery attempt in order to deflect blame for the shooting from Jackson, because Simon could not have had such a motive before the shooting took place.[9]

Neal argues that Jackson's motive to fabricate the robbery accusation against him already existed when Jackson spoke to Gilchrist. But it is immaterial when Jackson's motive originated, because it was Simon, not Jackson, whose prior consistent statement (his mention of the attempted robbery to Jackson) is at issue. Evidence that Simon first spoke of the robbery attempt before the shooting rebutted the defense claim that Simon's post-shooting statements were fabrications motivated to help Jackson. The possibility that Jackson himself was lying to Gilchrist simply went to the strength of the implication that Simon told him about the robbery attempt before the shooting, not to the relevance of that implication; whether Jackson was lying therefore was a question for the jury to resolve.[10]

 Neal also argues that the trial court did not expressly admit Simon's report to Jackson as a prior statement to rebut a claim of recent fabrication, and that we therefore cannot affirm on that ground because we cannot say the statement had to be admitted as a matter of

---

8. *See* Fed.R.Evid. 801 advisory committee's note (explaining that like non-assertive conduct, "verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted [is] also excluded from the definition of hearsay[.]").

9. *See* D.C.Code § 14–102(b)(2) (providing that a statement is not hearsay, and is admissible as substantive evidence, "if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is … consistent with the declarant's testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive"); *Prophet v. United States,* 602 A.2d 1087, 1093 (D.C.1992) ("[T]he statement must have been made at a time when,

considering all the circumstances, the witness did not have a motive to fabricate.").

10. *See* 2 Kenneth S. Broun et al., McCormick on Evidence § 270 (6th ed. 2006) ("Rarely, however, should statements of substantial importance to the case be excluded even under [Federal Rule of Evidence 403] based upon judicial doubts about the declarant's motivation. Under the structure of the Federal Rules, judgments about credibility should generally be left to the jury rather than preempted by a judicial determination of inadmissibility. Leaving the issue to the jury is particularly appropriate when the credibility issue can be readily appreciated by the jury, as is generally the case when the reason to question credibility rests upon the declarant's self-serving motivation.").

law.[11] In fact, we probably could say that evidence of Simon's pre-shooting report of the attempted robbery was admissible as a legal matter; we see no basis on which to exclude that evidence. But we need not decide that question, because Neal's argument fails for want of a valid premise. It is true the court did not rule expressly that Simon's report was admissible as a prior consistent statement to rebut the fabrication claim. But that does not mean the court was oblivious to the question, or that the court did not find the report admissible pursuant to D.C.Code § 14–102(b)(2). The prosecutor alerted the court to the issue when Jackson's statement to Gilchrist was admitted; and when, in closing argument, the prosecutor used Simon's report of the attempted robbery to Jackson before the shooting to refute the defense charge of fabrication, Neal did not object. At no point during the trial did Neal ever argue against this rationale for admissibility. The trial court therefore had no reason, in the middle of the prosecutor's closing argument, to address the issue on the record. And since we presume the court applied the law of evidence correctly unless the record shows the contrary,[12] we must affirm because we cannot say the record shows the report to have been inadmissible as a matter of law.[13]

## III. Marquita King's Claims— Sufficiency of the Evidence and Denial of Severance

■ Marquita challenges her threats conviction on two grounds, both of which are unavailing. Her first argument, that the trial court erred in denying her motion for judgment of acquittal, lacks merit.[14] To sustain a charge of felony threats, the government must prove the following elements: "(1) that the defendant uttered words to another person; (2) that the words were of such a nature as to convey fear of serious bodily harm to the 'ordinary hearer'; and (3) that [the defendant] intended to utter the words as a threat."[15] The jury fairly could find all three of these elements to have been proved beyond a reasonable doubt. It heard, as substantive evidence, Clark's grand jury testimony that Marquita stated, "There's that snitch, Mr. Clark. We know where he lives at, and there's ways to keep snitches quiet."

11. *See Wright v. United States*, 508 A.2d 915, 920 (D.C.1986) (holding that appellate court may affirm on an alternate discretionary ground only if the trial court "had but one option" (internal quotation marks omitted)).

12. *Cook v. United States*, 828 A.2d 194, 196 n. 2 (D.C.2003) ("Judges are presumed to know the law[.]").

13. *Cf. Comford v. United States*, 947 A.2d 1181, 1189 (D.C.2008) ("Where the judge has denied a defendant's prayer for relief during an earlier stage of a trial, and where the circumstances have changed as the case has progressed, a defendant must renew his request on the basis of the changed circumstances in order to preserve for appeal any contention based on the record as modified." (internal quotation marks omitted)).

14. We review the denial of a motion for judgment of acquittal under "the same standard as that applied by the trial court in determining whether the evidence was sufficient to convict," viewing the evidence in the light most favorable to the government and "giving full play to the right of the jury to determine the credibility[ ] [and] weigh the evidence." *Wright v. United States*, 926 A.2d 1151, 1152 (D.C.2007) (internal quotation marks omitted).

15. *Jenkins v. United States*, 902 A.2d 79, 86 (D.C.2006) (footnote and some internal quotation marks omitted). Our cases have not been consistent in phrasing the third element of threats; some cases have stated that the defendant need only have intended to utter the words that constituted the threat. *See id.* at 87 n. 11. For purposes of deciding Marquita's challenge, we need not resolve the inconsistency; we give her the benefit of the doubt.

Clark's recollection at trial that Marquita said "[s]omething about Mr. Clark was a snitch" and "[s]omething about he's a bitch ass" did not contradict what he told the grand jury-and even if it had, the jury would have been free to believe Clark's earlier recall of Marquita's words. Furthermore, the jury was entitled to evaluate those words as seriously threatening to the ordinary hearer notwithstanding Clark's statement to the defense investigator that he was "confident [Marquita's statement] wasn't in the nature of a threat."

■ We likewise are not persuaded that the trial court abused its discretion in denying Marquita's motion for severance under Criminal Rule 14.[16] "To show an abuse of discretion [in the denial of severance], the appellant must show not only prejudice, but manifest prejudice." [17] Marquita claims that she suffered manifest prejudice because the evidence against her was *de minimis* compared to the evidence against Neal.[18] We disagree. Although the charges against Neal were more numerous and more serious, the evidence against Marquita was hardly *de minimis:* Clark testified that when he saw her at the Wingate two days after the shooting, he heard her state: "There's that snitch, Mr. Clark.

We know where he lives at, and there's ways to keep snitches quiet." Moreover, the charges against Neal and Marquita occurred on different days and involved different crimes, and the trial court carefully instructed the jury to consider the evidence and charges against each defendant separately.[19] "[W]e see no indication that the evidence was too unwieldy for the jury to keep straight or that jurors were unable to make individual determinations about each appellant's guilt or innocence as to the substantive offenses with which each was charged." [20] Marquita's assertion that she was prejudiced by the joinder because she and Neal are cousins finds no support in the record. Her familial relationship to Neal was not irrelevant, and we have no reason to believe the jury attached undue significance to it. Finally, Marquita's argument that the evidence against Neal would not have been admitted against her had she been tried separately is flawed in two respects. First, at the very least, the evidence that Neal shot Jackson, that Clark responded to the shooting, and that he heard Jackson identify Neal, would have been admissible against Marquita as proof of her motive and to provide the context of her threat

---

16. Super. Ct.Crim. R. 14. In the proceedings below, Marquita also argued that the joinder of her case with that of her co-defendant Neal was improper under Criminal Rule 8(b) ("Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in 1 or more counts together or separately and all of the defendants need not be charged in each count."). Marquita has abandoned that argument on appeal. *See Bush v. United States,* 516 A.2d 186, 190–92 (D.C.1986).

17. *Mercer v. United States,* 724 A.2d 1176, 1193 (D.C.1999).

18. *See, e.g., Hawthorne v. United States,* 504 A.2d 580, 585 (D.C.1986) ("A defendant is entitled to severance on the basis of a disparity of evidence only when the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his co-defendants." (internal quotation marks omitted)).

19. *See Arnold v. United States,* 511 A.2d 399, 405 (D.C.1986) ("Severance may properly be denied if the evidence of the joined offenses is kept separate and distinct, provided that the case is submitted to the jury in a discrete manner, with instructions to consider the offenses separately.").

20. *Castillo–Campos v. United States,* 987 A.2d 476, 493 (D.C.2010).

against Clark.[21] Second, there was no danger that the jury misused the evidence against Neal to infer a criminal propensity on Marquita's part, especially given the separate and distinct nature of the allegations against the two defendants and the trial court's instruction that there was no allegation of collaboration between them.

## IV. Conclusion

For the foregoing reasons, we affirm appellants' convictions.

21. *See Welch v. United States,* 807 A.2d 596, 600 (D.C.2002) (upholding the admission of the defendant's other crimes, reasoning that "the activities were sufficiently connected with the events leading up to the murder so as to permit the government to present the full story of how the crime occurred").