David M. JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 83–1559.

District of Columbia Court of Appeals.

Argued Jan. 20, 1987.
Decided Dec. 9, 1987.*

Maureen T. Cannon, Public Defender Service, with whom James Klein, Public Defender Service, was on brief, for appellant.

Daniel S. Seikaly, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Kathleen E. Voelker, Asst. U.S. Attys., were on brief, for appellee.

Before MACK and STEADMAN, Associate Judges, and NEBEKER,** Associate Judge, Retired.

STEADMAN, Associate Judge:

Appellant contests his conviction for two counts of armed robbery and one count of assault with intent to rob. His principal argument involves Jencks Act issues.[1]

He asserts that (1) the trial court erred in its refusal to find that the government was "grossly negligent" in the loss or destruction of materials producible under the Jencks Act, 18 U.S.C. § 3500 (1985); and

---

* This opinion was released in typed form prior to printing.

** Judge Nebeker was an Associate Judge of this court at the time of oral argument. His status changed to Associate Judge, Retired, on September 1, 1987.

1. Appellant also contends that the court improperly foreclosed cross-examination of Beach on a possible reason for bias. We find no reversible error. *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

(2) even if the government committed no more than simple negligence, the trial court abused its discretion in its choice of sanctions. Finding no error, we affirm.

## I.

The events underlying appellant's conviction took place on the evening of March 9, 1982, when Sylvia Williams and two employees, Virgil Copeland and Randy Evans, were working at Williams' store. Two men, later identified as appellant and his co-defendant, entered the store and at gunpoint robbed the store, including taking property from Williams and Melvin Beach (a customer who entered the store during the robbery). At trial, appellant was convicted principally on the basis of eyewitness identifications made by those who were in the store on the night of the robbery.

Prior to trial, it became apparent during the identification suppression hearing that a problem existed with respect to the loss or destruction of three items of evidence, normally available to the defense as Jencks Act material. Specifically, the government was unable to produce the notebooks of two of the investigating officers, Stowe and Bradley, containing original notes of their investigations into the robbery. Bradley had taken notes of interviews the evening of the crime with Williams and Evans, wherein each had described the robbers.[2] Stowe's notebook contained notes of Copeland's descriptions of the robbers made that evening as well as statements by the three witnesses made at a later date when they examined a photo array which included appellant's picture. Stowe testified at the pretrial hearing that he had concluded he lost the notebook while investigating an unrelated altercation, when he jumped out of the car and gave chase to someone.[3] The third item of unavailable evidence was a recording of Williams' call to the emergency police number in which Williams had described appellant. The record had been destroyed sixty days after the crime pursuant to then administrative routine.

Ruling immediately prior to the commencement of the trial,[4] the trial court determined that as a sanction for the non-production of the lost items, the use of the photo array by the government would be limited and an instruction would be given regarding the missing items with a variant of the "missing witness" instruction.[5] In so doing, he made an explicit determination that the loss of Stokes's notes was not due to gross negligence or bad faith on behalf of the government.

At the time of that ruling, the trial court knew that the Bradley notes were probably lost and by our reading of the record considered the prejudicial effect of such loss on the defendants in dealing with the identification issues, including the crime-scene

---

2. The issue of the Bradley notes first arose following Evans' testimony as to the next to last witness at the pretrial hearing. The prosecutor undertook to determine whether Bradley had taken any notes at all. The next day the prosecutor in discussion prior to the trial court's ruling informed the court that Bradley, who was out of town, had told her the notes were in his desk, that a search of the desk had been unable to locate the notes, and that therefore, "we will have to presume at this point, for lack of any better information, that we do not have those notes."

3. Both Stowe and Bradley testified they were aware of the police general order on preservation of potentially discoverable material (which required that such material be placed in an investigative jacket case folder where practica-

ble, and if not, in an envelope or other appropriate container, to be logged in).

4. The court's original ruling was made just before lunch. When the court reconvened in the afternoon, the prosecutor reported that a significant problem with respect to the photo array had come to her attention during the noon hour. As a result, further testimony was taken from Stowe and another witness. The trial court revisited the *Jencks* issue and, following the concession of the government, expanded its initial ruling to bar use by the government of the photo array identifications.

5. Such an instruction was first suggested by Judge Leventhal, concurring, in *United States v. Bundy*, 153 U.S. App.D.C. 191, 194, 472 F.2d 1266, 1269 (1972) (jury "free to infer" that missing evidence would have been helpful to defendant).

descriptions.[6] The trial court did not know the details surrounding the loss of the Bradley notes. That information came out during the course of Bradley's testimony during the defense case.[7] However, although the subject of the lost notes had been raised at various points during the trial [8] and the sanction of the missing witness instruction was still to come, neither the trial court nor any party questioned the adequacy of the sanctions following Bradley's testimony.[9] Indeed, during the discussion about jury instructions, when appellant's counsel referred to the lost notes of both Stowe and Bradley, the trial court interrupted to remark that it had ruled that no gross negligence or bad faith was involved and reasserted the elements of the sanctions it had decided upon. We therefore conclude that on the record as a whole, the trial court may be fairly deemed to have implicitly found that the unavailability of the Jencks material was due to no more than ordinary negligence [10] and the sanctions effectively imposed on that basis.

## II.

■ Appellant disputes both the failure to find "gross negligence" and the limited nature of the sanctions imposed by the trial court. Determination by a trial court regarding the degree of negligence involved in the loss of Jencks material is a finding of fact which we will not disturb on appeal unless "clearly erroneous." *Johnson v. United States*, 336 A.2d 545, 547 (D.C.1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976), *see* D.C. Code § 17–305(a) (1981). Applying this standard to the evidence in the record, we uphold the trial court's conclusion that the government's inability to produce the Jencks Act material was not the result of gross negligence.

■ The decision as to appropriate sanctions for missing Jencks Act material is left to the discretion of the trial court, and we will reverse only if confronted with an abuse of that discretion. *Montgomery v. United States*, 384 A.2d 655, 662 (D.C. 1978). Appellant's principal attack at oral argument was on the form of the "missing evidence" instructions used by the trial court.[11] The trial court instructed the jury if it found that the failure of the officers to produce these notes "has not been sufficiently accounted for or explained" then the jury might, if it deemed it appropriate, "infer that the notes would have been unfavorable to the government." Appellant argues that the trial court should have instructed the jury that the loss was indeed the result of negligence (*i.e.*, had "not been

6. He noted, *inter alia*, "I think for purposes of this motion I must assume that [Detective Bradley's notes] cannot be found, and have not been accounted for, although I think that issue may still be open." He then directed the government to search further and advise how the notes came to be lost.

7. Bradley was unsure as to how his notebook had disappeared but theorized that it vanished when he changed desks at the police station.

8. For instance, in her opening statement, appellant's counsel mentioned that three crime-scene descriptions of the suspects had been given "to the two police detectives who were in charge of investigating the robbery, those descriptions were written down by the detectives in notes, and those notes are not here, those notes are missing."

9. At the close of the initial pretrial ruling, this colloquy had occurred:
THE COURT: Counsel for the Defense, did I miss any area you wish I should rule on that I didn't actually cover? For appellate purposes, I think all of those issues are covered.
[COUNSEL FOR APPELLANT]: I believe everything has been covered.
THE COURT: If you need a supplement finding in some area, you can ask for it.

10. If more was involved, striking would have been mandatory. *United States v. Jackson*, 450 A.2d 419, 427 (D.C.1982).

11. Appellant also attacks the sanction limiting use by the government of the photo array. While this action may have presented problems with defendant's use of the evidence, it does not follow that it was meaningless. Moreover, it appears that in any event, appellant got before the jury a major point he wished to make with respect to the showing of appellant's photo to the witnesses.
   In a broader sense, appellant attacks the inadequacy overall of the sanctions imposed in this case, taking into account the "totality of circumstances." *Montgomery v. United States, supra*, 384 A.2d at 662.

sufficiently accounted for or explained") [12] and that it must infer that the missing evidence would have been unfavorable to the government. We have, however, previously indicated that a missing evidence instruction, along the line suggested in *Bundy* that a jury is "free to infer" unfavorability, can be appropriate in the Jencks Act context. *Earl Jones v. United States*, 343 A.2d 346, 352 (D.C.1975). *See United States v. Peters*, 190 U.S.App.D.C. 370, 379, 587 F.2d 1267, 1276 (1978) (missing evidence instruction approved very similar to that used in case at bar).[13] We cannot say that the trial court abused its discretion in the fashioning of sanctions by wording the instructions as it did.

*Affirmed.*

MACK, Associate Judge, dissenting:

In this case, three eyewitness identification statements made immediately following the robbery, three eyewitness identification statements made at the time of a photo array, and a contemporaneous 911 recording describing the perpetrators were lost by the government. Two professionals of the Metropolitan Police Department independently lost notebooks containing discoverable statements and failed to take adequate steps to mitigate the prejudice to appellant as a result of the losses. The Jencks Act, requiring the preservation of all these materials, has been the law for thirty years. Explicit police regulations governing the preservation of this material have been on the books for fifteen years. On the facts of this case, therefore, the majority's deference to the trial court's incomplete findings regarding government negligence is inappropriate. Since the record amply supports a finding of gross negligence, the testimony of the three witnesses should have been stricken.

## I.

The government concedes that its failure to produce the identification statements and the 911 recording violated the Jencks Act. The only question, therefore, is the appropriate sanction for these violations.

## A.

The law is clear: "Where the loss [of Jencks material] is a result of bad faith or *gross negligence*, the trial court *must exclude the witness' testimony.*" *United States v. Jackson*, 450 A.2d 419, 427 (D.C. 1982) (emphasis added) (citing *Johnson v. United States*, 298 A.2d 516, 520 (D.C. 1972)). In my view, the cumulative negligence of the police department and the individual officers—resulting in the loss of six identification statements and the destruction of a 911 tape in one case—constitutes gross negligence.

Both Detectives Stowe and Bradley were individually negligent in losing the two notebooks containing the eyewitness identification statements. Since 1972, the Metropolitan Police Department, in response to prodding by the court (*see United States v. Bryant*, 142 U.S.App.D.C. 132, 142, 439 F.2d 642, 652 (1971)), has required officers to properly preserve and store potentially discoverable material. Metropolitan Police Department General Order Series 601, No. 2 (effective May 26, 1972) (as amended) (hereinafter "General Order No. 601.2"). Under General Order No. 601.2, all potentially discoverable material is to be maintained in an investigative jacket or case folder, which, in turn, is to be stored in a secure file cabinet. *Id.* at 2; *see Moore v. United States*, 353 A.2d 16, 18–19 (D.C. 1976). If the material cannot practicably be preserved in that manner, it is to be placed in an appropriate container, logged in, and turned over to the administrative

---

**12.** Appellant asserts that this phrase gives the jury the option to negate the trial court's finding of negligence. Assuming this is so, the effect of a missing witness instruction in a Jencks Act situation is to involve the jury in the matter, and whether to refer this particular aspect to the jury is but part of the trial court's overall discretion. In fact, the trial court in the portion of the instructions dealing with the recording of the telephone call omitted this phrase.

**13.** *Cf. Reed v. United States*, 383 A.2d 316, 320 (D.C.), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978) (missing evidence instruction assumed to be a permissible sanction, although its logic questioned).

lieutenant for security in a separate file cabinet. General Order No. 601.2, *supra,* at 2.

Both officers were veterans of the police force and testified that they were aware of their obligation to act in conformance with those regulations. Yet, approximately three months after the robbery and one month after the photo identification, Detective Stowe still carried his discoverable notes on his person. The resultant loss of the notebook in the course of police duties is neither surprising nor unpredictable. Indeed, General Order No. 601.2 was promulgated in part to protect against such a loss. Nor did Stowe, in recognition of the importance of the discoverable material to appellant's statutory and constitutional rights, attempt to mitigate the loss. He neither returned to the location of the street event where the loss occurred nor attempted to reconstruct the contents of the notebooks.

Similarly, Detective Bradley failed to store his notebook in a secure file cabinet, thus resulting in the loss of key identification statements. Bradley testified that he had stored most of the several hundred notebooks he had filed in his fifteen years as an officer in his desk, thus violating General Order No. 601.2 several hundred times. We are therefore confronted with what appears to be longstanding indifference by professional police officers to the requirements of the regulation—certainly a picture which has surfaced again and again.

The Department's failure to enforce the duty to preserve is a further factor in assessing the degree of negligence involved. Mere promulgation of 601.2 is ineffectual without enforcement. In *United States v. Bryant, supra,* 142 U.S.App.D.C. at 142, 439 F.2d at 652, the United States Court of Appeals for the District of Columbia Circuit not only cautioned the MPD to promulgate systematic procedures for the retention of Jencks materials, but also indicated its expectation that the Department would enforce and follow such procedures:

> [S]anctions for non-disclosure based on loss of evidence will be invoked in the future unless the Government can show

that it has promulgated, *enforced, and attempted in good faith to follow* rigorous and systematic procedures designed to preserve all discoverable evidence gathered in the course of a criminal investigation.

*Id.* at 142, 439 F.2d at 652 (emphasis added); *cited in Hardy v. United States,* 316 A.2d 867, 870 (D.C.1974). Eleven years after *Bryant,* at the time of this investigation, enforcement of General Order No. 601.2 was not taken seriously.

Such indifference to compliance and enforcement is even less understandable in light of this court's repeated warnings to the MPD to preserve potential discoverable material. In *Banks v. United States,* 305 A.2d 256, 259 (D.C.1973), Judge Gallagher, concurring, indicated that "there is no risk of a repetition of this [the destruction of notes containing identification material] in the future as a result of police regulations on preservation of such documents [*i.e.,* 601.2]." Despite such confidence, one year later, the court was again faced with destroyed notes and stated, "we assume the situation here described will not again recur." *Savage v. United States,* 313 A.2d 880, 884 (D.C.1974). Nevertheless, Judge Gallagher was shortly forced to note:

> This is still another instance where ... there apparently has not been compliance with Metropolitan Police General Order Series 601, No. 2.
>
> As stated in *Banks v. United States, supra* at 259 (Gallagher, J., concurring) the government gave us to understand that potentially discoverable material would be preserved in view of the terms of the General Order. That was more than a year ago. I would assume the government is taking steps to effectuate general compliance.

*Hardy v. United States, supra,* 316 A.2d at 871 (Gallagher, J., concurring) (citations omitted). Finally, in *Moore v. United States, supra,* 353 A.2d at 18 n. 7, after the loss of a complainant's initial description of an assailant, Judge Kelly reminded us that "[t]hree prior cases in this court have stressed the need to comply with this order." Despite these admonitions, here the

loss of six eyewitness statements resulted from the failure to comply with and enforce the adequate procedures for preservation of notes set forth in General Order No. 601.2.

In addition to the loss of six eyewitness identification statements, the 911 recording of the initial description of the assailants was erased. It appears that at the time of this investigation, no formal procedures for preserving 911 tapes were in place. As a policy, the Metropolitan Police Department preserved the tapes for only sixty days.[1] Not only should procedures have been in place for the proper preservation of these tapes given the ten years which had elapsed since *Bryant*, but also, the duration of the preservation was clearly not a realistic one in view of court schedules.

The government's argument that its sixty day policy of preserving the tapes resulted from a good faith belief in their undiscoverability is unavailing. The good or bad faith of the government in failing to develop adequate procedures for preservation is irrelevant. "[T]here is no exception for a good faith administrative decision that certain evidence is not discoverable and thus need not be preserved." *Bryant, supra,* 142 U.S.App.D.C. at 142, n. 21, 439 F.2d at 652 n. 21 (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963)). "[T]he courts, not the investigators or the prosecutors, make the decision as to whether evidence is discoverable, and . . . this decision cannot be made if the evidence has been destroyed." *United States v. Harris,* 543 F.2d 1247, 1252 (9th Cir.1976) (citing *United States v. Harrison,* 173 U.S.App.D.C. 260, 270, 524 F.2d 421, 431 (1975)).

In this case, therefore, the cumulative inattentiveness of two officers and the department to the statutory duty to preserve Jencks material resulted in the loss or destruction of seven discoverable items. Such conduct, taken in its entirety, clearly amounts to gross negligence and striking the testimony of the three witnesses whose statements were lost is the appropriate sanction.

### B.

The majority's reliance on deference to the trial court's finding of simple negligence cannot support affirmance in this case. At the time of the imposition of the sanctions, the trial court made a finding of "simple negligence" as to Detective Stowe's conduct only. The trial court made no findings whatsoever on the degree of negligence resulting from both the loss of Detective Bradley's notebook and the erasure of the 911 notes. Moreover, the trial court, in determining the appropriate sanction never considered the government's cumulative negligence. The majority's decision to impute a finding of simple negligence as to all the losses in this case resembles appellate factfinding.

The extent of this factfinding can be appreciated by reference to the state of the evidence at the time the trial court made its decision not to strike the testimony of the witnesses. In a pretrial motion to suppress identification testimony, the defense and the trial court first learned of the loss of Detective Stowe's notebook and the erasure of the 911 recording. Neither the trial court nor the defense were advised of the loss of Detective Bradley's notebook until the end of the hearing. At that time, the court instructed the government to present testimony from Detective Bradley. Testimony from Detective Bradley, however, was not subsequently presented.[2] The trial court, nevertheless, issued its sanctions without any reference to the loss of Detective Bradley's notebook or the prejudice resulting from such loss. Clearly, therefore, since the trial court had little evidence before it on Bradley's conduct, it made no implicit finding as to the degree of negligence ensuing therefrom.[3]

---

1. As of June 24, 1983, 911 tapes are required to be preserved for one year. General Order No. 601.2, *supra,* at 2.

2. The testimony from Detective Bradley was not elicited until the defense called him as a witness during appellant's trial, well after the three key government witnesses had testified.

3. The majority effort to engraft the trial court's post-trial findings onto its pretrial ruling must fail. *Ante* at 410–411. During the conference

Nor did the trial court's findings reflect the fact that eyewitness identification statements made immediately following the robbery formed a part of the lost material. The majority here can derive no comfort from the fact that the trial court's exclusive focus on the lost statements made at the photo array was perhaps a result of the government's failure to present the testimony of Detective Bradley. As we have previously noted, "[t]he initial description of an assailant by the victim or other eye witness is crucial evidence, and the notes taken of that description should be kept and produced." *United States v. Bundy,* 153 U.S.App.D.C. 191, 192, 472 F.2d 1266, 1267 (1972), *cited in Moore v. United States, supra,* 353 A.2d at 19. Given the centrality of the notes of an initial description of an assailant, findings of a trial court which fail to reflect the loss of such material are obviously inadequate.

Moreover, "implicit" findings in this case are inappropriate since it is clear that the trial court never considered the degree of the *cumulative* negligence of the individual officers and the Metropolitan Police Department. Indisputably, the aggregate of all the government actions or omissions in one case must be assessed in determining the degree of negligence resulting in the non-production of discoverable material.

Since the findings in this case are not really "implicit" at all, but rather, incomplete, I cannot agree with the majority's deferential position.

## II.

Finally, the sanctions chosen by the trial court in the exercise of its discretion reflect the incompleteness of the findings and consequently fail to adequately redress the harm resulting from the nonproduction.

The government's case rested upon the identification testimony of three store employees. Appellant's misidentification defense sought to discredit the testimony of those three witnesses. All of the initial

statements of the witnesses, including their preliminary descriptions of the robbers and their reactions to the first photographs they viewed, were lost. Appellant was denied access to the most reliable descriptions of the perpetrators, thereby severely curtailing his ability to effectively cross-examine the witnesses on the issue at the very heart of his defense. Since the principal objective of the Jencks Act is "to aid in the search for truth by permitting access to prior statements of the government witnesses for possible impeachment," *Fields v. United States,* 368 A.2d 537, 539 (D.C. 1977), its purpose was frustrated in this case, and the prejudice to appellant was substantial.

Forbidding the government's use of the photo identifications as a sanction for the loss of all the statements was clearly ineffective to redress the harm resulting from the loss of the statements which were made at the time of the robbery. Indeed, with respect to the statements, this sanction is meaningless. It is not possible to speculate on the value of the lost statements to the defense. As this court has previously noted:

> [W]e share the Supreme Court's concern that an "appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled."

*Middleton v. United States,* 401 A.2d 109, 123 (D.C.1979) (citing *Rosenberg v. United States,* 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959)). We should not "countenance avoidance of our rule that original notes be preserved unless the harmlessness is ... self-evident." *United States v. Bundy, supra* note 1, 153 U.S. App.D.C. at 192, 472 F.2d at 1267; *see Middleton, supra,* 401 A.2d at 123–124 (erroneous nonstriking of testimony was harmless in view of the "exceptionally strong case" against appellant).

---

on the instructions, the trial court stated: "I ruled it wasn't gross negligence or bad faith." The relevant findings, however, occurred pretrial—at the time the court decided on the ap-

propriate sanctions. It is undisputed that the pretrial findings do not reflect consideration of Bradley's conduct.

Furthermore, the ineffectiveness of the so-called "missing evidence" instruction which was used in this case is self-evident. Here, the trial court instructed the jury that if "the failure of the [police] to produce their notes has not been sufficiently accounted for or explained," an inference unfavorable to the government may be drawn. The possibility of drawing an adverse inference, however, was almost nonexistent. The police witnesses themselves had already testified to the jury that the notes were simply lost (not that they might have contained exculpatory or impeachment material). Since the jury had no reason to find the explanation other than credible or sufficient, the generation of adverse inference was extremely remote. The "sanction" was so nominal as to be no sanction at all.[4]

### III.

The striking of a witness' testimony in a criminal trial is a harsh sanction. As a general proposition, we all agree that all admissible evidence should be used in the prosecution of persons charged with crimes. Lest we forget, however, that the pursuit of this goal must be considered together with what is, in effect, our own interest, it is worth remembering that it is "less evil that some criminals should escape than that the government should play an ignoble part." *Olmstead v. United States*, 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Holmes, J., dissenting). The very purpose of the Jencks Act is to protect one's due process right to a fair trial by preserving evidence in the hands of the government. When the government loses or destroys evidence in contravention of this law, it acts in derogation of, not only our constitutional right to a fair trial, but our interest in the preservation of evidence necessary to convict criminals. That alone is a persuasive reason for applying the sanction mandated by the Act.

I therefore respectfully dissent.

---

**4.** Indeed, the general translation of the "missing witness" instruction to lost Jencks material is problematic. In the missing witness situation, a party's failure to call a "peculiarily available" witness who could "elucidate the transaction," *see Thomas v. United States*, 447 A.2d 52, 57 (D.C.1982), can potentially generate a logical inference that the testimony of the witness will be unfavorable since the party otherwise would have called the witness. In the context of lost Jencks material, however, an explanation which, by definition, is credible (since the testimony otherwise would have been stricken) will not generate an adverse inference, and an instruction permitting such inference will be ineffectual. *Cf. United States v. Bundy, supra*, 153 U.S.App.D.C. at 194, 472 F.2d at 1269.