*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CO-0636

CARLTON HENDERSON, III, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2017-CF2-010911)

(Hon. Steven N. Berk, Trial Judge; Hon. Julie H. Becker, Remand Judge)

(Argued March 15, 2023                    Decided October 12, 2023)

*Lee R. Goebes*, Public Defender Service, with whom *Samia Fam* and *Mikel-Meredith Weidman*, Public Defender Service, were on the briefs, for appellant.

*Bryan H. Han*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb* and *John P. Mannarino*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and SHANKER, *Associate Judges*, and FISHER, *Senior Judge*.

Opinion for the court by *Associate Judge* Easterly.

Dissenting Opinion by *Senior Judge* Fisher at page 32.

EASTERLY, *Associate Judge*: Carlton Henderson challenges the Superior

Court's order, on remand from this court, denying his motion to strike the testimony

of the sole witness at his suppression hearing as a sanction for government negligence under the Jencks Act and Super. Ct. Crim. R. 26.2. We hold that (1) the remand court committed clear error in finding that the government's actions did not amount to gross negligence, and (2) in the absence of an argument from the government to the contrary, striking the officer's testimony was compelled by our case law requiring such a sanction upon a finding of gross negligence. We thus vacate Mr. Henderson's convictions and again remand this case to the Superior Court.

## I. Facts and Procedural History

After an individual approached Officer Kirkland Thomas and told him that a man nearby had a gun in his pants, the police stopped, searched, and arrested Mr. Henderson on weapons charges in June 2017.[1] Both at his initial appearance and after, Mr. Henderson requested that all police radio broadcasts (also known as "radio runs") be preserved and provided. Prior to trial, Mr. Henderson moved to suppress the gun and ammunition the police found when they searched him, arguing that the officers did not have reasonable, articulable suspicion under *Terry v. Ohio*, 392 U.S.

---

[1] Mr. Henderson was charged with one count each of violating D.C. Code § 22-4503(a)(1) (unlawful possession of a firearm with a prior conviction), D.C. Code § 7-2502.01(a) (unlawful possession of an unregistered firearm), D.C. Code § 7-2506.01(3) (unlawful possession of ammunition), and D.C. Code § 7-2506.01(b) (possession of a large capacity ammunition feeding device).

1 (1968), to stop and search him for weapons. A suppression hearing was held before the Honorable Steven Berk.

At the May 2018 suppression hearing, the government called Officer Thomas as its only witness. The government elicited on direct examination the narrative of when, where, and how Officer Thomas received a tip from a passerby and broadcast the tip to other members of his team:

> Q: Were you alone or were you with anybody else at that time [that you received the tip]?
> A: At that time, I was alone, because I was going to get my lunch.
> . . .
> Q: And what did you do with the information that [the tipster] provided to you?
> A: I let my other teammates know on our radio channel. And at that time, I was going back to the station, because I was by myself, and I didn't want to go in the area by myself.
>
> *       *       *
>
> Q: Now, after you received that information, you told us that you relayed it to your team?
> A: Yes.
> Q: And after doing that, what did you do?
> A: I went to the station to pick up the rest of my teammates, and I went down to the [store the tipster had mentioned].

Officer Thomas confirmed on cross-examination that he "broadcasted the lookout over" his team's channel "right away" after receiving the tip.

Defense counsel marked as Exhibit 1 a "clip from the radio run provided in discovery" and played it for Officer Thomas. Counsel and Officer Thomas then had an exchange in which Officer Thomas informed counsel that Exhibit 1 was the recording of the voice of a different officer:

> Q: Now, that's your voice. Correct, Officer?
> A: No.
> Q: That was not your voice?
> A: No.
> Q: I'm going to play it again for you. Okay?
> A: Yes.
> (Whereupon, the tape was played.)
> Q: So it's your testimony that that's not your radio transmission with the lookout in this case?
> A: Correct. That's Officer Williams repeating what I am saying.

The government did not address on redirect the fact that Exhibit 1 did not appear to be the recording of Officer Thomas's radio run.

After Officer Thomas finished testifying, defense counsel raised the issue of Officer Thomas's radio broadcast, arguing that the government had failed to provide it to the defense as a Jencks statement.[2] Counsel explained that he had expected the radio run provided by the government and played in court to be "Officer Thomas'[s] broadcast of the lookout," but "Officer Thomas testified it was actually Officer

---

[2] Jencks Act, 18 U.S.C. § 3500; *see also* Super. Ct. Crim. R. 26.2(a) (requiring the government to produce upon request "any statement of the witness that is in their possession and that relates to . . . the witness's testimony").

Williams'[s]." Counsel also noted that Officer Thomas had testified that "he broadcast the lookout to the rest of his team who were at the station," i.e., when he was not with Officer Williams. Counsel informed the suppression court that, based on Officer Thomas's testimony, "we're missing a radio run broadcast of Officer Thomas. . . . [W]e are missing that Jencks."

The prosecutor responded both that the government had "turned over fully what [the government] ha[d]," specifically fifty-nine seconds of recording from which the defense excerpted the clip it had played, and that "there isn't anything else that is out there that we have not turned over." But the prosecutor also offered to ask "the officer that specific question[] just to make sure." The suppression court ordered a brief recess to allow the prosecutor to speak to Officer Thomas.

After the recess, defense counsel represented that his team had listened to all the recordings turned over by the government and had confirmed that none contained Officer Thomas's broadcast of the initial lookout. Accordingly, defense counsel moved to strike Officer Thomas's testimony as a sanction for the government's failure to fulfill its disclosure obligations.

The prosecutor responded that "there's no Jencks violation. The radio run [the government had turned over] is the radio run that the officer was referring to when he testified." The prosecutor recounted his conversation with Officer Thomas during the recess: "I asked the officer was there anything else that he was referring

to? He said, 'No, this is it.'" The prosecutor further represented that the officer had told him:

> at the point that the defense counsel stopped the recording[,] that it goes on, and you actually hear two voices on there; and he says that he was talking to Officer Williams. And so, defense counsel has the full radio run that was made and transmitted. There was nothing else that is outstanding . . . .

Parrying an offer by the suppression court to allow the defense to recall Officer Thomas to the stand, the defense kept the focus on the government, asking if the prosecutor had listened to the radio broadcast itself. The prosecutor "confirm[ed]" that he had "listened to it yesterday . . . when [he] sent [the recording] to defense counsel [and] . . . actually pointed [counsel] to the specific time that he used today"; the prosecutor also stated that "in speaking to the officer this morning, I played it for him and listened to it again with him this morning," before court.[3] The prosecutor then repeated that the radio run "continues on [past the part defense counsel played during the hearing], and you hear more than one voice on the radio."

Defense counsel told the suppression court and the prosecutor that the fact that Officer Thomas's voice was heard after Officer Williams's voice on this recording was nonresponsive to the defense's concerns. Because the "officer's

---

[3] The prosecutor also spoke to Officer Thomas during a recess but did not play the recording at that time.

sworn testimony" that the radio run was Officer Williams "'[r]epeating the lookout that [Officer Thomas] had given,'" the defense was "looking for . . . the lookout *before* that 59 seconds" (emphasis added) of radio run the government had provided.

The prosecutor responded by accusing defense counsel of "opening the door to some sort of witch-hunt for something that does not exist," and maintained "there was nothing else that was made outside of what we turned over and what he listened to[,] . . . [and] [t]he defense was given exactly what was made." Defense counsel replied that his argument that a radio run was missing was based on Officer Thomas's statements "under oath" which were made after Officer Thomas "listened to [the disclosed recording]": "[W]e . . . know[] based on the officer's sworn testimony that he broadcast the lookout. We know that there's a missing lookout. It is not a witch-hunt. We know from the officer's testimony." The prosecutor reiterated, however, that the radio run that was played "is the only thing that there is."

After further back and forth, the suppression court listened to the entire 59-second radio run, focusing on the government's representation that, after Officer Williams's broadcast, Officer Thomas's voice could be heard. Defense counsel again tried to explain that "we know that Officer Thomas broadcasted a lookout. So how does Officer Williams get a lookout to repeat if Officer Thomas has not already broadcasted a lookout prior to this clip? We're just missing it." The government

again made the observation that "you hear the two different voices on there" and represented that "that area" was what Officer Thomas had been referring to on the stand; there was nothing else.

The suppression court ruled that, "based on both the tape that [it] listened to and the representations of government counsel" there was no Jencks violation. Notwithstanding the court's ruling, defense counsel attempted one last time to help the court understand that (1) the missing recording was from when "prior to Officer Williams[] being involved, Officer Thomas was by himself" and "met with the anonymous tipper"; (2) Officer Thomas "himself broadcasted a lookout. . . . [T]hat is what we are missing"; and (3) the recording of Officer Williams's radio run had to come from a later point in time because Officer Williams had gotten the information he broadcast from Officer Thomas. The government stood silent, and the suppression court informed counsel that it was denying the motion to strike Officer Thomas's testimony as a sanction for the government's violation of its Jencks obligations. Mr. Henderson was convicted that day in a stipulated trial.

Mr. Henderson appealed the denial of the motion to strike Officer Thomas's testimony and this court remanded. *Henderson v. United States*, No. 18-CF-817, Mem. Op. & J. at 3 (D.C. Feb. 28, 2020). We directed the Superior Court to "conduct an evidentiary hearing to determine if a recording of Officer Thomas's original description exist[ed]," and to determine the appropriate course of action if the

recording had existed "but was subsequently lost or destroyed." *Id.* at 3 & n.2.

The case was assigned to the Honorable Julie Becker on remand. At the May 2021 remand hearing, the government, represented by a different prosecutor, first called a supervisor from the Transcription Unit of the Office of Unified Communications, which stores the recordings of all MPD radio transmissions for three years. The OUC witness testified that in response to a 2020 request from the remand prosecutor she had searched for radio runs connected to Mr. Henderson's case on the secure channel for the seventh district and had only found 59 seconds of communication. The government then called Officer Thomas. Consistent with his testimony at the suppression hearing, Officer Thomas testified on direct that he had communicated the tip for the person with a gun to his fellow officers "[o]ver the radio." Although Officer Thomas could not remember if he was alone when he communicated the tip, he acknowledged on cross that when he testified under oath at the suppression hearing he "actually . . . remembered what had happened" and he agreed that "the things that [he] testified to . . . were true." The government did not seek to ask Officer Thomas how he could have been alone when he issued the first lookout but with Officer Williams when a recording was made. But the remand court did. In response to the court's questions, Officer Thomas surmised that he inadvertently set his radio to the wrong channel, which would also have been recorded, and that when he did not get a response to his lookout, he had repeated it

to Officer Williams when they connected in person.

Asked by the remand court what he thought "the evidence is at this point . . . regarding the recording," the prosecutor conceded that there was a missing recording from before Officer Thomas "met up" with Officer Williams "on [a] channel that the government did not find and disclose to defense counsel." In light of this concession, and the fact that the recording of this 2017 radio run had now been destroyed per OUC's retention policy, defense counsel argued that Officer Thomas's testimony should be struck as a sanction. Defense counsel did not contend that the government acted in bad faith. Defense counsel did, however, argue that the government had been grossly negligent by failing to diligently look for the missing recording in response either to the defense's discovery requests prior to the suppression hearing or to the testimony of its own witness at the suppression hearing—both points in time before the OUC would have destroyed the recording.[4]

The remand court asked the parties to brief the issue of the appropriate sanction, but before it ended the hearing, it allowed the government to recall the OUC witness and the defense to recall Officer Thomas. The OUC witness testified

---

[4] The court asked the prosecutor representing the government on remand about his contact with OUC in 2020, while the case was on appeal the first time. The prosecutor explained that he had reached out to OUC to ensure that the government had not missed anything on the seventh district channel, but he did not speak to Officer Thomas at this time and did not do so until the court scheduled the remand hearing.

that there are "maybe about 100 channels that [are] out there" but that some of these channels "are not consistently used on a daily basis"; and, although it would be time consuming, if they had been able to get more specifics about who had made the broadcast when and under what circumstances, OUC could have located a recording of it. Officer Thomas testified that given the setup of his radio, if he "accidentally switched to another channel" using the buttons on the device, he would have switched to "[o]ne of five or six other channels"; but if he switched zones using the dial at the top, he might have accessed 80-100 channels.

As directed by the remand court, the parties submitted in writing their arguments about whether the government had been grossly negligent, which the defense asserted would require the court to strike Officer Thomas's testimony. The remand court subsequently issued an order concluding that the government had failed to fulfill its Jencks obligations. Specifically, the court found that "there was, in fact, another recording of Officer Thomas's lookout, made prior to the one the government played at the suppression hearing" but "that recording [of Officer Thomas's broadcast] has been destroyed pursuant to the government's regular retention policy."

The remand court also found that "both the police and the prosecutor were negligent in failing to discover the error before or during the hearing on the motion to suppress." The court stated that:

> [g]iven Officer Thomas's testimony – that he broadcast the lookout immediately upon receiving the tip – the government should have realized that the radio run it produced, which contained Officer Williams's lookout, was not the only recording in this case. This was especially so after defense counsel raised the point at the suppression hearing, prompting the prosecutor and Officer Thomas to examine the issue again. Had the government followed the point to its logical conclusion, it would have known to look for the first recording at the OUC. And, as it acknowledges, had the government looked for the other radio run it likely would have found it, albeit with some difficulty.

(internal quotation marks and citation omitted).

Although the remand court quantified this negligence as "significant," the court declined to find that the government was grossly negligent. The remand court reasoned that "[t]he issue of the missing radio run here arose in the middle of the suppression hearing, and appears to have confounded not only the officer and the prosecutor, but also the trial court." Contrasting this scenario with the government's loss of physical evidence of "obvious significance" in violation of Rule 16 in *Smith v. United States*, 169 A.3d 887, 893 (D.C. 2017), the court found the existence of a missing radio run was "not 'obvious,'" and did not become so until the remand hearing. (The remand court also noted that Officer Thomas's testimony about broadcasting on the wrong channel "shed[] light on why both he and the prosecutor believed there were no additional radio runs.") After weighing the degree of negligence, the importance of the evidence lost, and the totality of the evidence adduced at the suppression hearing, the remand court found that the "balance of factors" did not warrant sanctions even if the government had been grossly

negligent. Mr. Henderson timely appealed.

## II. Analysis

The government has "an affirmative duty" under the Jencks Act, 18 U.S.C. § 3500(b), and Super. Ct. Crim. R. 26.2 "to preserve 'statements' of its witnesses and, upon motion of the defendant, to disclose and produce those statements" which relate to the subject of their testimony. *Slye v. United States*, 602 A.2d 135, 138 (D.C. 1992); *see also Robinson v. United States*, 825 A.2d 318, 325-26 & n.4 (D.C. 2003). "The purpose of the Jencks Act is to aid in the search for truth by permitting access to prior statements of government witnesses for possible impeachment." *Slye,* 602 A.2d at 138 (internal quotation marks omitted); *see also United States v. Perry,* 471 F.2d 1057, 1062 n.21 (D.C. Cir. 1972). "That purpose is frustrated when the government . . . allows potential Jencks Act statements to be needlessly destroyed or lost," *Slye*, 602 A.2d at 138, and the government bears the "heavy burden . . . to explain the loss of" any Jencks material. *Robinson*, 825 A.2d at 330. When the government violates its Jencks obligation, the trial court typically has discretion to craft appropriate sanctions depending on, among other things, the government's degree of negligence and the importance of the lost evidence. *Id*. at 331. If the government's culpability in the loss of Jencks material rises to the level of gross negligence or bad faith, however, this court has said "the trial court must exclude the . . . testimony" of the witness whose statement was lost. *United States*

*v. Jackson*, 450 A.2d 419, 427 (D.C. 1982) (citing *Johnson v. United States*, 298 A.2d 516, 520 (D.C. 1972)); *see also Jones v. United States*, 535 A.2d 409, 411-12 & n.10 (D.C. 1987) (upholding imposition of missing evidence instruction where the court found less than gross negligence but noting that "[i]f more was involved, striking would have been mandatory").

On appeal Mr. Henderson argues that, just as in *Smith*, "two responsible government departments," 169 A.3d at 894—the police and the prosecution—failed to take the necessary steps to preserve and produce the recording of Officer Thomas's radio run, and thus the court should have concluded the government was grossly negligent. Mr. Henderson further argues that this case is "far more egregious" than *Smith*, because the prosecution obfuscated the recording's existence while there was still time to find it before it was destroyed, by "offering the logically impossible explanation that the radio run Officer Thomas was talking about was given *after* the Williams lookout." Mr. Henderson argues that, as a result of this gross negligence, striking Officer Thomas's testimony at Mr. Henderson's suppression hearing was the required sanction; but even if a discretionary assessment of sanctions was warranted, anything less than striking Officer Thomas's testimony would be unreasonable. The government has not contested that a determination of gross negligence would require Officer Thomas's testimony at the suppression hearing to be struck. The government argues only that its negligence in failing to

produce the recording of Officer Thomas's radio run did not rise to the level of gross negligence and that, in light of the government's ordinary negligence, the remand court reasonably exercised its discretion not to impose a sanction.

## A. Whether the Government's Conduct Was Grossly Negligent

In a number of cases, this court has said that "[d]etermination by a trial court regarding the degree of negligence involved in the loss of Jencks material is a finding of fact which we will not disturb on appeal unless 'clearly erroneous.'" *See Jones v. United States*, 535 A.2d at 411; *accord Slye*, 602 A.2d at 139. The "ultimate inquiry" of "appl[ying] the controlling legal standard to the historical facts," *see Thompson v. Keohane*, 516 U.S. 99, 112-13 (1995) (internal quotation marks omitted), may well be more appropriately termed a mixed question of fact and law that we review de novo. *See Socash v. Addison Crane Co.*, 346 F.2d 420, 422 (D.C. Cir. 1965) (Bazelon, C.J., concurring) (internal quotation marks omitted) (opining that "ultimate determinations, such as negligence vel non, are mixed questions of law and fact freely reviewable on appeal"); *cf. Miller v. United States*, 14 A.3d 1094, 1121-23 (D.C. 2011) (concluding that the trial court's determination of whether evidence was suppressed for *Brady* purposes involved the "legal consequences of the undisputed historical facts" and so was not entitled to appellate deference). But we need not divert our attention to that question in this case because we conclude that the remand court's determination of less-than-gross negligence on this record

was clearly erroneous.[5] *See Lawrence v. United States*, 566 A.2d 57, 60 (D.C. 1989) (explaining "the judge's factual findings will not be disturbed unless they are clearly erroneous, *i.e.,* without substantial support in the record."); *see also* D.C. Code § 17-305(a) (granting this court authority to overturn factual determinations that are "plainly wrong or without evidence to support [them]").

The remand court found that "both the police and the prosecutor were negligent in failing to discover" that the government did not have Officer Thomas's

---

[5] This court has not articulated a standard definition of gross negligence in the Jencks or Rule 16 sanctions context, and we do not attempt to do so in this case. We focus instead on the particular record facts. Although the government relies on *Atkinson v. District of Columbia*, 281 A.3d 568, 571 (D.C. 2022), this court has not resolved whether to embrace civil negligence standards when assessing whether to impose sanctions for discovery violations in criminal cases. *See Crocker v. United States*, 253 A.3d 146, 159 & n.39 (D.C. 2021) (declining to apply civil standards to evidentiary issues in a criminal case, but not deciding what constitutes gross negligence in the Rule 16 context). *But see Battocchi v. Wash. Hosp. Ctr.*, 581 A.2d 759, 766-67 (D.C. 1990) (importing standards for missing evidence instructions from the Jencks context into the civil context). Moreover, the government provides no explanation why the particular definition of gross negligence discussed in *Atkinson*, regarding governmental liability for emergency vehicle accidents under D.C. Code § 2-412, should apply in this case. *Atkinson*, 281 A.3d at 570-71. This standard is only one of many. And for that reason, gross negligence in tort law has been called "a legal twilight zone which exists somewhere between ordinary negligence and intentional injury," Blain LeCesne, *Crude Decisions: Re-examining Degrees of Negligence in the Context of the BP Oil Spill*, 2012 Mich. St. L. Rev. 103, 122, 129 (2012) (internal quotation marks omitted), ranging from "a lack of even slight diligence or care" to "a conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party," *Negligence, Black's Law Dictionary* (11th ed. 2019).

recording to provide to the defense, but the government's collective conduct did not amount to gross negligence because "the issue of the missing radio run . . . arose in the middle of the suppression hearing, and . . . confounded" both Officer Thomas and the prosecutor at the suppression hearing.[6]  Based on its findings that the existence of the recording was "not 'obvious,'" the remand court, citing *Smith v. United States*, 169 A.3d 887 (D.C. 2017),[7] concluded that the government actors involved could not be grossly negligent for failing to investigate further until it was too late to save the recording from being destroyed.  The record does not support these findings.

---

[6] The remand court further observed that the issue "confounded . . . the trial court," but that is not a mitigating factor in assessing the government's negligence on this record.  As discussed below, the suppression court's confusion is attributable at least in part to the misdirection the court received from the prosecution.  Nevertheless, the suppression court had an "affirmative duty to conduct an independent inquiry into the existence of Jencks material," *Lazo v. United States*, 54 A.3d 1221, 1232 (D.C. 2012) (internal quotation marks omitted) (quoting *Flores v. United States*, 698 A.2d 474, 481 (D.C. 1997)), and its failure to fulfill that obligation necessitated a remand.

[7] Although we agree that the obviousness of the existence of another recording is an appropriate consideration in assessing the government's negligence in this case, the "obviousness" consideration in *Smith*, a Rule 16 case, related to a different issue: the evidentiary import of the destroyed physical evidence (a pair of shorts in which drugs were found). *See Smith*, 169 A.3d at 893-84.  Here the evidentiary import of the recording of Officer Thomas's broadcast was established by the Jencks Act, *see supra* note 2, and Super. Ct. Crim. R. 26.2(f)(2) (defining a statement subject to disclosure under the rule to include "a substantially verbatim, contemporaneously recorded recital of the witness's oral statement") and was not contested.

Although the existence of a missing recording was fully exposed by defense counsel at the suppression hearing, to say the issue "arose" at that time overlooks the government's obligation *before* a court proceeding to locate, preserve, and produce the statements of its witnesses. *Slye*, 602 A.2d at 138 (explaining that the Jencks Act "imposes an affirmative duty upon the government to preserve 'statements' of its witnesses and, upon motion of the defendant, to disclose and produce those statements"). Thus, the issue "arose" when defense counsel requested that all police radio runs be preserved, or, at the latest, the day before the hearing when the prosecutor obtained the recording of Officer Williams's 59-second broadcast—the recording that could not have been Jencks for the witness the government intended to put on the stand, Officer Thomas.

Nor did any evidence come to light at the remand hearing that made it newly clear that the recording of Officer Thomas's broadcast was missing. To the contrary, the evidence at the remand hearing regarding the government's knowledge of the existence of a missing recording was precisely the same as it had been at the suppression hearing. Consequently, it was just as obvious at the suppression hearing that the government had not done—and continued not to do—what was necessary to locate the recording.

In particular, we see no evidence supporting either the remand court's finding that the suppression prosecutor was "confounded" or its assessment that he "believed

there were no additional radio runs." Because the government did not call the suppression prosecutor to testify at the remand hearing, *but see Robinson,* 825 A.2d at 330 (explaining the government bears the "heavy burden . . . to explain the loss of" any Jencks material), the only evidence of his state of mind is from the transcript of the suppression hearing, the review of which led the remand court to conclude that the prosecutor should have realized the government had not fulfilled its Jencks obligation, i.e., there was no basis for any confusion. There is no point in that transcript at which the suppression prosecutor expressed confusion, nor did the prosecutor act confused. Rather he ignored the evidence, he did not ask questions, and he attacked the only person (defense counsel) who did.

Both Officer Thomas's testimony that he was alone when he broadcast the anonymous tip and defense counsel's cross-examination of Officer Thomas establishing that his voice was not on the recording produced by the government could not have made more plain that the recording of Officer Thomas' broadcast was missing. But the prosecutor's immediate response was to deny there was anything else to turn over. To be sure, the prosecutor volunteered to speak to Officer Thomas and subsequently represented to the court that the officer had told him during a recess that the broadcast to which the officer had been referring in his testimony was the broadcast Officer Williams made in Officer Thomas's presence. This could not be squared with Officer Thomas's sworn testimony, however, as

defense counsel immediately pointed out. And, if in fact it was what Officer Thomas told the prosecutor—but we note the prosecutor did not call Officer Thomas back to the stand[8]—it should have prompted a confused prosecutor to ask probing questions to get to the bottom of the matter (as was ultimately done at the remand hearing), instead of to simply accept an explanation that was patently illogical. Lastly, when defense counsel continued to press the already clear points that the recording the government had provided could not be Jencks for Officer Thomas, the prosecutor's explanation that the recording produced was the one about which Officer Thomas had testified could not be correct, and thus a recording was missing, the prosecutor did not indicate that he did not understand the operative facts.[9] Instead, he reacted

---

[8] Given that this proffer did not align with Officer Thomas's testimony at the suppression hearing (or at the remand hearing reaffirming the truth of his suppression hearing testimony), the government should have put Officer Thomas back on the stand at the suppression hearing if it wanted to rely on his out-of-court statements. *Cf. Johnson v. United States*, 347 F.2d 803, 805 (D.C. Cir. 1965) ("It is elementary . . . that counsel may not premise arguments on evidence which has not been admitted."). The government asserts, however, that "[t]he prosecutor . . . offered to recall Officer Thomas for further inquiry, which defense counsel declined." This is factually wrong; the *court* offered defense counsel that opportunity. *See supra* Part I. It is also legally irrelevant because it is the government's burden to preserve evidence and disprove potential Jencks violations once the defense makes a prima facie case that Jencks material has not been produced. *See Williams v. United States*, 355 A.2d 784, 788 (D.C. 1976).

[9] The fact that it did not become clear until the remand hearing what had happened to the missing recording is beside the point. It was clear at the suppression hearing that the recording was missing, and had the prosecutor accepted that fact, he could have made the necessary inquiries to find it before its destruction. The obvious

first by attacking defense counsel for doing their job, and then by making the nonresponsive assertion that the government had produced the only recording it had located. We thus see no foundation for the remand court's determination that the prosecutor was "confounded" or that he legitimately "believed" there was nothing else to turn over under Jencks.

Our dissenting colleague cites *Anderson v. City of Bessemer City* for the proposition that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," 470 U.S. 564, 574 (1985). But that principle only comes into play when there is *some* substantial evidence pointing in different directions. *See Johnson v. United States*, 232 A.3d 156, 167-68 (D.C. 2020) (explaining "[a] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" but that "[w]here there are two *permissible* views of the evidence, the factfinder's choice between them cannot be clearly erroneous") (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 394-95 (1948) and *Anderson*, 470 U.S. at 574) (emphasis added)). Here our point is that the government had put forward *no* evidence to support the

---

first step would have been to review the five or six channels Officer Thomas testified at the remand hearing he might have switched to by pressing the wrong button on his radio.

remand court's particular finding that the prosecutor was confounded, and our law is clear that the absence of supporting evidence for factual findings constitutes a basis to disregard them. *See Lawrence*, 566 A.2d at 60 (explaining that "the judge's factual findings will not be disturbed unless they are clearly erroneous, *i.e.*, without substantial support in the record"); *see also Hawkins v. United State*s, 663 A.2d 1221, 1225 (D.C. 1995) ("We are bound by the trial court's factual findings unless clearly erroneous *or* not supported by the evidence." (internal citation omitted) (emphasis in the original)).

Instead of being confounded, the suppression hearing transcript shows that the prosecutor failed to take the steps he should have taken to obtain the recording of Officer Thomas's broadcast, actively disregarded evidence that it was missing, and sowed confusion in the wake of his negligence. First, the prosecutor, who told the suppression court that he had met with Officer Thomas before the suppression hearing and listened to the 59-second recording of Officer Williams's radio run at least twice—once before he turned it over to the defense, and then with Officer Thomas—should have known that this recording could not be Jencks for Officer Thomas: even if the prosecutor could not distinguish Officer Thomas's voice from Officer Williams's and even if he had not been told by Officer Thomas that his voice was not on the recording, the prosecutor should have known that a recording with two voices on it could not be the recording of Officer Thomas's solo broadcast.

Second, the prosecutor failed to acknowledge on his own that the produced recording was not Jencks material for Officer Thomas after the officer testified at the suppression hearing that the radio run played by defense counsel was "*not* [his] radio transmission with the lookout in this case"; he had been "alone . . . going to get [his] lunch" when he got the tip about the person with the gun; and he had broadcast the tip to his "teammates . . . [as he] was going back to the station, because [he] was by [him]self, and [he] didn't want to go in the area by [him]self." Third, the suppression prosecutor refused to accept that the recording of Officer Thomas's broadcast was missing once defense counsel pointed it out. As the remand court found, the prosecutor should have realized the recording of Officer Williams's lookout:

> was not the only recording in this case. . . . *especially . . . after defense counsel raised the point at the suppression hearing*. . . . Had the government followed the point to its logical conclusion, . . . it would have known to look for the first recording at the OUC.

(emphasis added) (internal quotation marks omitted). Fourth, instead of following the point to its "logical conclusion," the prosecutor went in the opposite direction and pursued an illogical argument: the prosecutor argued that the radio run Officer Thomas testified to making alone and the radio run later made by Officer Williams with Officer Thomas at his side were one and the same. This simply could not be, as defense counsel pointed out. Fifth, the prosecutor then attacked defense counsel for pointing out the illogic of his argument and accused counsel of "opening the door to some sort of witch-hunt for something that does not exist" when defense counsel

was simply zealously advocating for the discovery to which Mr. Henderson was clearly entitled based on the sworn testimony of the government's own witness. Sixth, the prosecutor's argument confounded the suppression court, leading to the court's erroneous determination that no Jencks violation had occurred.

As we discuss further below, this conduct, in our view, is sufficient to support a finding of gross negligence and the court should have found so here. But, for completeness, we consider the trial court's findings regarding Officer Thomas. As with the prosecutor, we conclude that there is no evidence that Officer Thomas was confounded by the missing radio run. Indeed, there is evidence to the contrary. At the suppression hearing he testified very clearly on direct examination that he was alone when he made his broadcast and on cross examination that the 59-second recording the prosecution had turned over to the defense was not his voice. The missing Jencks issue was not discussed until after Officer Thomas finished testifying. At that point, the prosecutor did not seek to recall Officer Thomas to ask him about a missing recording under oath. The prosecutor merely proffered to the court that Officer Thomas had told him there was no recording other than Officer Williams's. This is not evidence. *Cf. Johnson*, 347 F.2d at 805 ("It is elementary . . . that counsel may not premise arguments on evidence which has not been admitted."). Where the government never put Officer Thomas back on the stand at the suppression hearing to explore the issue of the missing recording and never elicited

any testimony on remand to demonstrate that he had been confused about its existence, the remand court should not have attributed any confusion to Officer Thomas, particularly given that when he did take the stand again at the remand hearing, he readily explained that the reason the broadcast had not been found on the seventh district channel was likely because he had accidentally switched radio channels.

But just as there is no evidence that Officer Thomas was confused, there is very little in the way of evidence regarding what Officer Thomas did or did not do to preserve and produce the recording of his broadcast. Officer Thomas never testified either at the suppression hearing or the remand hearing about when he first learned that the prosecution was looking for a recording of his broadcast, what he had done or not done to help the prosecution find it, or when he first listened to the 59-second recording of Officer Williams's broadcast that was turned over to defense counsel. And again he was never asked at the remand hearing about the statements the prosecutor had attributed to him via proffer at the remand hearing. In the absence of such testimony, there is not much in the way of support for the conclusion that Officer Thomas was negligent beyond accidentally broadcasting on the wrong channel (which did not impede his broadcast from being recorded and preserved), an act which seems more appropriately characterized as a mere "mishap all of us

may encounter," as opposed to gross negligence. *(Earl W.) Jones v. United States*, 343 A.2d 346, 349 n.6, 352 (D.C. 1975) (internal quotation marks omitted).

We acknowledge that the government has not challenged the remand court's determination that Officer Thomas was negligent. Nevertheless, we are reluctant to endorse Mr. Henderson's argument that the loss of Officer Thomas's recorded broadcast was attributable to the combined negligence of two government entities— the police and the prosecution—and that a finding of gross negligence was thus compelled pursuant to *Smith*. Instead, we view *Smith* as informative and as supporting a more general proposition that repeated acts of negligence attributable to the government, taken together, may amount to gross negligence. In *Smith*, the negligent acts were attributable to two separate government actors: neither the police nor the prosecutor preserved clothing in which the drugs the defendant was charged with possessing were found, though they both had opportunities to do so. *Smith*, 169 A.3d at 893-94. In Mr. Henderson's case, the prosecutor alone repeatedly neglected his duty under Jencks. We conclude that this was "no less than gross negligence," just as in *Smith*. *Id.* at 894.

We buttress this determination by looking to our ordinary negligence cases in the Jencks context. Although these cases do not establish a bright line divide between ordinary and gross negligence, the government's actions in this case far surpass the "mishaps" deemed ordinary negligence in our case law. *See (Earl W.)*

*Jones*, 343 A.2d at 349 n.6, 352 (officer was unable to find notes months later although he had taken steps to "safeguard" them); *see also, e.g.*, *Woodall v. United States*, 684 A.2d 1258, 1260 n.3, 1261 (D.C. 1996) (officer followed protocol to turn in contact card but department was later unable to find it after thorough search); *Moore v. United States*, 353 A.2d 16, 19 (D.C. 1976) (officer generally stored notes in his locker but later could not find them). Here, there were aggravating factors: the prosecutor actively disregarded that more steps were required to find and produce the missing radio run even when he was confronted with facts and argument at the suppression hearing that made the need for further action patently clear; he put forward an illogical argument as to why nothing was missing and wrongly accused defense counsel of pursuing a "witch-hunt"; and his denial of the existence of the recording of Officer Thomas's broadcast led to its destruction. As both the remand court and the government acknowledged, if the government had taken steps to find the radio run at the time of the suppression hearing, it "likely would have found it."

We disagree with the government that our decision in *Slye v. United States*, should compel us to put this case on the ordinary negligence side of the line. In *Slye*, the prosecutor took no action in response to a defense request for recordings of 911 calls by the complainant and those recordings were destroyed. 602 A.2d at 137. On appeal, we concluded that the record supported a determination that "the government's failure to produce was the result of negligence but not gross

negligence or willful misconduct." *Id.* at 139. But we noted that "we [were] deeply disturbed by the indifference shown by the government in its failure to preserve discoverable evidence." *Id.* at 138. The government argues that because the prosecutor took action in Mr. Henderson's case, his conduct cannot be deemed worse than the prosecutor's complete failure to act in *Slye*. To the contrary, *Slye* only reinforces our conclusion of gross negligence in Mr. Henderson's case. Unlike in *Slye*, the prosecutor here did not just fail to act in time for the radio run to be preserved; the government repeatedly denied that there was anything to further investigate or preserve in the face of conflicting sworn testimony by its witness. The government's active resistance to its Jencks obligation pushed its "indifference" over the threshold of "deeply disturb[ing]" into the realm of gross negligence. *Slye*, 602 A.2d at 138.

## B. Appropriate Sanction

We review the remand court's choice of sanction for abuse of discretion. *See Robinson*, 825 A.2d at 331-32. The remand court erroneously quantified the government's negligence as merely "significant," but, citing *Smith*, a Rule 16 case, noted that even if the government had exhibited gross negligence, striking Officer Thomas's testimony as Mr. Henderson requested "would not necessarily follow." In making this ruling, the court did not address clear statements of law from our Jencks

cases, cited by Mr. Henderson, uncontested by the government,[10] and based in the language of the statute itself,[11] that require a court to strike a witness's testimony in its entirety once there is a finding that Jencks material has been lost or destroyed as a result of gross negligence. *See Jackson*, 450 A.2d at 427 (per curiam) ("Where the loss is a result of bad faith or gross negligence, the trial court must exclude the witness'[s] testimony.") (citing *Johnson*, 298 A.2d at 520); *see also Jones v. United States*, 535 A.2d at 411 n.10 ("If more [than ordinary negligence] was involved, striking would have been mandatory."). As the trial court's decision not to strike Officer Thomas' testimony fell outside the conceded "range of permissible alternatives," *Johnson v. United States*, 398 A.2d 354, 365 (D.C. 1979), and the government has not argued that the court's refusal to strike the testimony of Officer Thomas—the only witness who it called to testify at the suppression hearing—was harmless, *see id.* at 366 (recognizing harm is a component of an abuse of discretion analysis); *Hairston v. United States*, 908 A.2d 1195, 1199-1200 (D.C. 2006) (per

---

[10] As noted above, the government's arguments against sanctions are premised on the assumption that it committed only ordinary negligence.

[11] 18 U.S.C. § 3500(d) ("If the United States elects not to comply with an order of the court . . . the court shall strike from the record the testimony of the witness . . . ."); Super. Ct. Crim. R. 26.2(e) ("If the party who called the witness disobeys an order to produce[,] . . . the court must strike the witness's testimony from the record."); *see also Perry*, 471 F.2d at 1063 (rejecting a "literal" reading of "elects not to comply" and interpreting it as a "purposive or negligent act on the part of the Government which [leads to] . . . the loss or destruction of documents which otherwise the Government could be compelled to produce").

curiam) (government may waive harmlessness where it is not obvious), we conclude the court abused its discretion.

### III.   Conclusion

For the foregoing reasons, we remand to the trial court to strike Officer Thomas's testimony, vacate Mr. Henderson's convictions, and conduct further proceedings consistent with this opinion.

*So ordered.*

FISHER, *Senior Judge*, dissenting: If I were a trial judge, I might well decide to strike the testimony of Officer Thomas.  That would be a reasonable decision based on this record.  But I am not a trial judge, and my colleagues in the majority are not either.  It seems to me that they have reached their decision based on a combination of appellate fact-finding and de novo review.

The Supreme Court has instructed "that the administration of the Jencks Act must be entrusted to the 'good sense and experience' of the trial judges subject to 'appropriately limited review of appellate courts.'" *United States v. Augenblick*, 393 U.S. 348, 355 (1969) (quoting *Palermo v. United States*, 360 U.S. 343, 353 (1959)). Our own cases confirm that our review should be limited.  Thus, "[t]he decision whether or not to impose sanctions for Jencks Act violations, as well as the choice of sanctions, is within the trial court's discretion.  Its decision either way will not be

overturned on appeal unless the appellant can show that this discretion has been abused." *Slye v. United States*, 602 A.2d 135, 138 (D.C. 1992) (citing *Jones v. United States*, 535 A.2d 409, 411 (D.C. 1987)).

"Discretion signifies choice," and "[t]he concept of 'exercise of discretion' is a review-restraining one." *Johnson v. United States*, 398 A.2d 354, 361-62 (D.C. 1979). Because Judge Becker did a careful and conscientious job of complying with our remand order, and considered the proper factors, I cannot agree that she abused her discretion in deciding not to strike the officer's testimony.

The majority concludes to the contrary by saying that the government was guilty of gross negligence and that the trial court therefore had no choice but to strike the testimony. But here, again, our review is limited. "Determination by a trial court regarding the degree of negligence involved in the loss of Jencks material is a finding of fact which we will not disturb on appeal unless it is clearly erroneous." *Jones*, 535 A.2d at 411 (internal quotation marks omitted). Although the majority acknowledges this standard of review, it fails to apply it correctly.

The clearly erroneous "standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City*, 470 U.S. 564,

573 (1985). "[A]ppellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Id.* (internal quotation marks omitted).

According to the majority, there was no evidence to support the trial court's finding that the prosecutor was "confounded" during the suppression hearing or the court's assessment that he believed there were no additional radio runs. It is true that the prosecutor did not *say* that he was confused, but that does not mean that he wasn't. Perhaps the prosecutor should not have been confounded, but the transcript of the hearing certainly suggests that he was not thinking clearly.[1] More to the point, the majority relies upon the very same record to conclude that the prosecutor was not "confounded." The Supreme Court has cautioned that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Bessemer City*, 470 U.S. at 574.

We should adhere to the standards that govern our review and should affirm the trial court's decision.

---

[1] Defense counsel did not claim that the prosecutor was acting in bad faith, and Judge Becker concluded that there was no basis for a finding of bad faith. The majority does not assert otherwise.